# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

RESTAURANT LAW CENTER, and
NEW YORK STATE RESTAURANT
ASSOCIATION,

               *Plaintiffs*,

     v.

CITY OF NEW YORK, and
SANDRA ABELES, in her official capacity
as Commissioner of the NEW YORK
CITY DEPARTMENT OF CONSUMER
AND WORKER PROTECTION,

               *Defendants*.

Case No. 1:21-cv-04801-DLC

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ........................................................................................... 1

II.    BACKGROUND .............................................................................................. 2

    A.    The Plaintiffs......................................................................................... 2

    B.    The Just Cause Laws ............................................................................ 3

III.   STANDARD OF REVIEW .............................................................................. 7

IV.   ARGUMENT ................................................................................................... 8

    A.    The NLRA Preempts the Just Cause Laws ........................................ 8

    B.    The Just Cause Laws Violate the Dormant Commerce Clause ......................... 15

    C.    The Just Cause Laws Violate New York Law of At-Will Employment............. 19

    D.    The Just Cause Laws' Mandatory Arbitration Provision Is Illegal..................... 22

V.    CONCLUSION.............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*520 S. Mich. Ave. Assocs., Ltd. v. Shannon,*
  549 F.3d 1119 (7th Cir. 2008) ...............................................................................9, 10, 11, 12

*Andrew v. J.P. Morgan Chase & Co.,*
  No. 18-4421, 2018 WL 4926440 (S.D.N.Y. Oct. 9, 2018) (Cote, J.), *aff'd*, 783
  F. App'x 102 (2d Cir. 2019) ...................................................................................................19

*Appel v. Goldberg,*
  43 Misc. 3d 1221(A), 992 N.Y.S.2d 157 (N.Y. Sup. Ct. 2014)...............................................23

*AT & T Techs., Inc. v. Comm'cns Workers of Am.,*
  475 U.S. 643 (1986).................................................................................................................23

*AT&T Mobility LLC v. Concepcion,*
  563 U.S. 333 (2011).................................................................................................................22

*Bassette v. Stone Container Corp.,*
  No. 89-33, 1992 WL 613289 (D. Mont. Oct. 9, 1992), *aff'd*, 25 F.3d 757 (9th
  Cir. 1994) ............................................................................................................................9, 14

*Bldg. Owners & Managers Ass'n of Chi. v. City of Chi.,*
  No. 19-7212, 2021 WL 168966 (N.D. Ill. Jan. 19, 2021)........................................................10

*Boys Markets, Inc. v. Retail Clerks Union, Loc. 770,*
  398 U.S. 235 (1970).................................................................................................................14

*Brown v. Eli Lilly & Co.,*
  654 F.3d 347 (2d Cir. 2011).......................................................................................................7

*Cachia v. Islamorada,*
  542 F.3d 839 (11th Cir. 2008) ...........................................................................................17, 18

*Carter v. Rosenberg & Estis, P.C.,*
  No. 95-10439, 1997 WL 299398 (S.D.N.Y. June 5, 1997) (Cote, J.) ....................................20

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)...................................................................................................................7

*Chamber of Commerce v. Bragdon,*
  64 F.3d 497 (9th Cir. 1995) .............................................................................................9, 10, 11, 13

*City of New York v. Chevron Corp.*,
993 F.3d 81 (2d Cir. 2021)..........................................................................................21

*Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*,
298 F.3d 201 (3d Cir. 2002)........................................................................................16

*Colodney v. Continuum Health Partners, Inc.*,
No. 03-7276, 2004 WL 829158 (S.D.N.Y. Apr. 15, 2004) (Cote, J.)............................19, 20

*Concerned Home Care Providers, Inc. v. Cuomo*,
783 F.3d 77 (2d Cir. 2015).........................................................................................11

*Dep't of Revenue of Ky. v. Davis*,
553 U.S. 328 (2008)...................................................................................................15

*Fort Halifax Packing Co. v. Coyne*,
482 U.S. 1 (1987)....................................................................................................9, 14

*Friends of the E. Hampton Airport, Inc. v. Town of East Hampton*,
841 F.3d 133 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2295 (2017)...........................8

*Gateway Coal Co. v. United Mine Workers of Am.*,
414 U.S. 368 (1974)...................................................................................................23

*Golden State Transit Corp. v. City of Los Angeles*,
475 U.S. 608 (1986).....................................................................................................9

*Granite Rock Co. v. Teamsters*,
561 U.S. 287 (2010)...................................................................................................22

*Greens at Half Hollow, LLC v. Town of Huntington*,
15 Misc. 3d 415, 831 N.Y.S.2d 649 (N.Y. Sup. Ct. 2006)......................................25

*Haw. Pac. Health v. Takamine*,
No. 11-00706, 2012 WL 6738548 (D. Haw. Dec. 31, 2012)...................................15

*Healthcare Ass'n of N.Y. State, Inc. v. Pataki*,
471 F.3d 87 (2d Cir. 2006).........................................................................................14

*Horn v. N.Y. Times*,
100 N.Y.2d 85 (2003) ..........................................................................................19, 20

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977)...................................................................................................16

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,
803 F.3d 389 (9th Cir. 2015) .................................................................................16, 17

iii

*Jancyn Mfg. Corp. v. Suffolk Cty.*,
  71 N.Y.2d 91 (1987) ................................................................................................21

*Lamps Plus, Inc. v. Varela*,
  139 S. Ct. 1407 (2019) ...........................................................................................22

*Legato Vapors, LLC v. Cook*,
  847 F.3d 825 (7th Cir. 2017) .................................................................................18

*LensCrafters, Inc. v. Robinson*,
  403 F.3d 798 (6th Cir. 2005) .................................................................................15

*Lodge 76, Int'l Ass'n of Machinists v. Wis. Emp't Relations Comm'n*,
  427 U.S. 132 (1976) ....................................................................................... *passim*

*Maine v. Taylor*,
  477 U.S. 131 (1986) ..........................................................................................15, 18

*Mason v. AmTrust Fin. Servs., Inc.*,
  No. 19-8364, 2020 WL 6365448 (S.D.N.Y. Oct. 29, 2020) (Cote, J.) ...................19

*Mayor of New York v. Council of New York*,
  780 N.Y.S.2d 266 (N.Y. Sup. Ct. 2004) ................................................................21

*McDonald v. N.Y.C. Campaign Fin. Bd.*,
  40 Misc. 3d 826 (N.Y. Sup. Ct. 2013), *aff'd as modified*, 117 A.D.3d 540 (1st
  Dep't 2014) ........................................................................................................21, 22

*Metro. Life Ins. Co. v. Massachusett*s,
  471 U.S. 724 (1985).............................................................................................9, 13

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State*,
  550 N.E.2d 919 (N.Y. 1990)................................................................................23, 24

*Murphy v. Am. Home Prods. Corp.*,
  58 N.Y.2d 293 (1983) .............................................................................................20

*Myers v. Hirst*,
  No. 09-4436, 2011 WL 116142 (S.D.N.Y. Jan. 13, 2011) (Cote, J.) .....................20

*New Energy Co. of Ind. v. Limbach*,
  486 U.S. 269 (1988)................................................................................................15

*Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*,
  511 U.S. 93 (1994)..................................................................................................16

*Paperworkers v. Misco, Inc.*,
  484 U.S. 29 (1987)..................................................................................................12

*Pike v. Bruce Church, Inc.*,
  397 U.S. 137 (1970).................................................................18, 19

*Sabetay v. Sterling Drug*,
  69 N.Y.2d 329 (1987) ....................................................................20

*Stoffer v. Dep't of Pub. Safety of Huntington*,
  77 A.D.3d 305 (2d Dep't 2010) .....................................................25

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
  559 U.S. 662 (2010).......................................................................22

*Taylor v. State*,
  160 Misc. 2d 120, 608 N.Y.S.2d 371 (N.Y. Ct. Cl. 1994)...............23

*Turner v. Sheppard Grain Enters., LLC*,
  127 N.Y.S.3d 260 (N.Y. Sup. Ct. 2020) ...........................................7

*Will Poultry, Inc. v. Teamsters Loc. 264*,
  No. 13-1135, 2013 WL 6837547 (W.D.N.Y. Dec. 23, 2013)...............14

*Ex parte Young*,
  209 U.S. 123 (1908)..........................................................................8

**Statutes**

42 U.S.C. § 1983.................................................................................8

Civil Service Law § 75–b(3)(c) .........................................................24

Executive Law § 297(4)(c)(iii) ..........................................................24

Federal Arbitration Act ("FAA")......................................................22

National Labor Relations Act ("NLRA") ....................................8, 9, 10, 15

**Other Authorities**

Brand & Biren, *Discipline & Discharge in Arbitration* § 2 (3d ed. 2015) ...................12

Elkouri & Elkouri, *How Arbitration Works* § 15.2.A.ii (8th ed. 2016)....................12

Federal Rule of Civil Procedure 56(c) ..................................................7

New York Constitution Article I, section 2 .................................23, 24

New York Constitution Article VI, section 7(a)..................................24

New York Constitution Article IX, section 2(c)...........................20, 21

New York Constitution Article IX, section 3(a)(2) ........................................................25

New York City Administrative Code §§20-1271 - 1275 (collectively, "Just Cause
    Laws").............................................................................................................. *passim*

United States Constitution, Article VI .....................................................................8, 25

## I.       INTRODUCTION

It is difficult to read news about the food service industry in 2021 without coming across headlines addressing the current labor shortage.  Employers in New York City are in heated competition for workers, as "there are simply many more job openings than available workers." Plaintiffs' L.R. 56.1 Statement of Undisputed Material Facts ("SOUF") ¶¶ 81-82 (Declaration of Leni Battaglia ("Battaglia Decl.") Exs. 6-7).

Despite the job security inherently provided by such competition, the New York City Council passed two bills, Int. No. 1396-A and Int. No. 1415-A, codified at NYCC §§ 20-1271 to 1275 (the "Just Cause Laws" or the "Laws")—supposedly needed to protect against meritless terminations—at the behest of, and drafted by, the Service Employees International Union ("SEIU").  During recovery from the current pandemic, the City has imposed draconian laws abrogating at-will employment and requiring extensive administrative procedures, including a compelled private arbitration mechanism.  Thus, while a host of City, state, and federal laws already protected against terminations for discriminatory or other unlawful reasons, covered national fast-food employers—and those fast-food employers alone—may now have every employment separation second-guessed as to whether the business reasons to separate an individual were not only good enough, but also properly papered, signed, worded, and stored.

This conflict between the current business reality and the justification for the Laws exists because the Laws' true goal is not actually about establishing any "minimum labor standard" for all similarly situated workers in the City.  It is instead an intentional effort to impose typical collective-bargaining terms on targeted fast-food employers to aid the SEIU's unionizing efforts. SOUF ¶¶ 20, 24.  The resulting legislation is in direct conflict with federal and state law in at least four independent ways.

First, the Laws are preempted by the National Labor Relations Act ("NLRA") under the

1

*Machinists* doctrine. *Lodge 76, Int'l Ass'n of Machinists v. Wis. Emp't Relations Comm'n*, 427 U.S. 132, 140, 146 (1976). The Laws interfere in the collective-bargaining process, imposing conditions in areas that Congress intended to leave unregulated. And they are not a "minimum labor standard"—they apply narrowly, only to a small subset of workers in a particular industry, and the detailed procedures mandated are a targeted invasion of the bargaining process.

Second, the Laws also violate the dormant Commerce Clause. The only employers subject to the Laws are fast-food restaurants that are part of a chain with 30 or more establishments nationally. The burdens of the Laws will fall entirely or almost entirely on national, interstate businesses; in fact, we have been unable to identify any intrastate restaurants that would be subject to the Laws. SOUF ¶ 77. The imposition of these extraordinary (and economically irrational) burdens only on interstate restaurants impermissibly discriminates against interstate commerce.

Third, the attempt to eliminate at-will employment is preempted by New York State common law, which establishes a strong policy in favor of at-will employment that can be overcome only by the parties' agreement in their contract or by the action of the State Legislature.

Fourth, the compulsory arbitration provisions violate federal and State law, by imposing arbitration without the consent of the parties, depriving defendants of the right to try by jury in actions for compensatory damages, and impermissibly depriving State courts of jurisdiction.

For each of these reasons, the Just Cause Laws are legally deficient. Because there are no disputed issues of fact regarding the legality of the laws, the Court should grant summary judgment, declare the Laws invalid, and enjoin Defendants from enforcing them.

## II.   BACKGROUND

### A.   The Plaintiffs

The Restaurant Law Center is a public policy organization affiliated with the National Restaurant Association, the largest foodservice trade association in the world. It provides industry-

specific guidance for owners, operators, and legal operators through webinars and through its Compliance Library, including providing industry-specific COVID-19 advice and guidance. *Id.* at ¶ 85 (Battaglia Decl. Ex. 3). The New York State Restaurant Association is a not-for-profit employer association that represents food service establishments throughout New York State. It provides a forum for restaurants to exchange ideas and information, participate in creative problem-solving, and receive education. *Id.* at ¶ 86 (Battaglia Decl. Ex. 4).

### B.      The Just Cause Laws

*Legislative History*—On December 15, 2020, the New York City Council passed the Just Cause Laws, which limit when certain "fast-food employers" can "discharge" their employees either by termination or a reduction in their employees' hours by more than 15%. *Id.* at ¶ 44. On January 5, 2021, Mayor Bill de Blasio signed the bills into law. *Id.* at ¶ 2. The Just Cause Laws largely took effect on July 4, 2021. *Id.* at ¶ 3.

The goal of the Just Cause Laws is to aid the SEIU's years-long, unsuccessful effort to unionize the fast-food industry. SEIU representatives lobbied the City to advance its unionization efforts, and City Councilmember Brad Lander, sponsor of the Just Cause Laws, strategized with those representatives to further those efforts. "Strategy" emails between Lander and union representatives expressly acknowledge that the "principle of 'just cause' is the keystone of the collective bargaining agreement" and "marks a sharp dividing line between union and nonunion or at-will workers." *Id.* at ¶ 20. As Lander openly has admitted, the goal of these Laws was to get fast-food workers "part of what a union provides." *Id.* at ¶ 24. Thus, the express purpose of the Just Cause Laws is to provide that keystone for fast-food workers in national chains, without following the federally mandated collective bargaining process.

Union representatives also assisted in drafting the legislation, and City Council staff readily incorporated edits from union attorneys and strategic campaign coordinators throughout the

process. *Id.* at ¶¶ 12-22. At one point, the union proposed new language on progressive discipline, and Lander approved it in just over two hours. *Id.* at ¶ 21 (Lander approving SEIU 32BJ representative's suggested new language to "deal with [a] progressive discipline issue").

*Just Cause and Related Requirements*—The Just Cause Laws apply only to "fast food establishments" that are part of a chain and are one of 30 or more establishments nationally, including establishments operated pursuant to a franchise agreement. *Id.* at ¶ 39. This brief refers to these establishments as "Targeted Fast-Food Employers." Other fast-food employers, no matter their size or profitability, are not subject to these rules. *Id.* at ¶¶ 39-40.

Employees of Targeted Fast-Food Employers shall not be discharged or have their hours reduced above certain thresholds "except for just cause or for a bona fide economic reason." *Id.* at ¶ 43. "Just cause" means "the fast-food employee's failure to satisfactorily perform job duties or misconduct that is demonstrably and materially harmful to the fast-food employer's legitimate business interests." *Id.* at ¶ 45.

Targeted Fast-Food Employers must establish "progressive discipline" policies and provide training on those policies. *Id.* at ¶ 47. The Just Cause Laws require that the policies "provide[] a graduated range of reasonable responses . . . from mild to severe, depending on the frequency and degree of the failure." *Id.* at ¶ 48. On July 6, 2021, the New York City Department of Consumer and Worker Protection ("DCWP") issued a Frequently Asked Questions ("FAQs") document on the Just Cause Laws, yet it essentially just repeats the definition *verbatim*, providing no concrete guidance. *Id.* at ¶ 7 (Battaglia Decl. Ex. 5 at p. 23). Before imposing any discipline, a Targeted Fast-Food Employer must conduct "a fair and objective investigation into the job performance or misconduct." SOUF ¶¶ 50-51. Employers have been given no guidance on what is required for such an investigation other than that the "scope of investigation depends on the

circumstances." *Id.* at ¶ 51.  Targeted Fast-Food Employers can only terminate employees for "just cause" after utilizing a progressive discipline policy, unless an employee's misconduct represents an "egregious failure by the employee to perform their duties" (*id.* at ¶ 52), which the FAQs limit to behavior that is illegal or immediately threatens others' health and safety.  *Id.* at ¶ 53.

*Lay-Off Provisions*—To layoff or reduce an employee's hours by 15% or more without "just cause," a Targeted Fast-Food Employer must have a "bona fide economic reason."  *Id.* at ¶ 54.  The statute defines this narrowly, requiring business records showing "that the closing[] or technological or reorganizational changes are in response to a reduction in volume of production, sales, or profit."  *Id.*  This means that there must have been an actual "reduction" in production, sales, or profit.  A Targeted Fast-Food Employer cannot reorganize its business to earn additional profit (or make additional sales).  Nor can it discharge employees (or reduce their hours) because it anticipates a future reduction in production, sales, or profit, or because its operations require more of a certain type of employee or less of another type of employee.

Discharges based on bona fide economic reasons also must be done in "reverse order of seniority . . . so that the employees with the greatest seniority shall be retained the longest."  *Id.* at ¶ 55.  Targeted Fast-Food Employers may not consider any other factors when conducting layoffs, such as business need or employees' responsibilities, ability, or skill.  *Id.* at ¶¶ 33, 54-55.

*Statutory Remedies and Employers' Presumption of Guilt*—Discharged employees can ask their choice of tribunal to second-guess their employers' reasoning, the fairness of the required progressive discipline policies, and whether any investigations were "fair and objective."  When an employee sues, the Targeted Fast-Food Employer always bears the burden to prove just cause or a bona fide economic reason by a preponderance of the evidence.  *Id.* at ¶ 57.

Fast-food employees can challenge their discharge or hours reduction by filing a complaint with the DCWP (*id.* at ¶ 56), filing a civil action in a court of competent jurisdiction, (*id.*), or bringing a private arbitration proceeding. *Id.* If a fast-food employee decides to proceed with arbitration, including class arbitration, Targeted Fast-Food Employers are compelled to participate, despite having never consented to having their disputes resolved through private arbitration rather than in court. *Id.* at ¶¶ 56-58. The DCWP determines the number of arbitrators who will sit on the panel. *Id.* at ¶ 60. If a committee (which includes the parties) cannot select enough arbitrators, the DCWP then selects individuals to serve as arbitrators. *Id.* at ¶ 62.

The Just Cause Laws impose both civil liability and administrative penalties for a violation. *Id.* at ¶ 66. If an arbitrator finds that a fast-food employer violated the Just Cause Laws, the arbitrator can require the employer to pay attorney fees and costs of the arbitration, require reinstatement or restoration of hours, and award back pay, recission of discipline, and/or compensatory damages or injunctive relief. *Id.* at ¶ 68. If the DCWP finds a violation, it can order reinstatement and restoration of hours; require attorney fees and costs, (*id.*); and impose civil penalties and order restitution, other forms of equitable relief, or the payment of monetary damages. *Id*. at ¶ 66. A court likewise can order reinstatement, restoration of hours, and attorney fees, (*id.* at ¶ 65), as well as compensatory, injunctive, and declaratory relief. *Id.* at ¶ 67

**FAQ document—**The DCWP issued nonbinding FAQs on July 6, 2021. *Id.* at ¶ 7. They provide examples and some guidance on what is required in a progressive discipline policy, what constitutes egregious misconduct, and training and investigations required. *Id*. (Battaglia Decl. Ex. 5 at p. 22-29). All these only add to the burdens imposed by the Just Cause Laws, including by limiting "egregious" conduct to conduct that is "illegal" or "immediately threatens [] health and safety." *Id.* (Battaglia Decl. Ex. 5 at p. 27). The FAQs' guidance on layoffs and bona fide

6

economic reasons create more hoops for employers to jump through to let workers go or increase production after layoffs. *Id.* (Battaglia Decl. Ex. 5 at p. 29-31). Moreover, FAQs are not legally binding, *Turner v. Sheppard Grain Enters., LLC*, 127 N.Y.S.3d 260, 262 (N.Y. Sup. Ct. 2020), so implementing the Laws is still plagued with uncertainty.

**Harming Plaintiffs' members**—Many of Plaintiffs' members operate fast-food restaurants within New York City, with more than 30 establishments nationwide, and are therefore subject to the Laws. *Id.* at ¶ 78. Many of Plaintiffs' members would never have agreed to the draconian substantive and procedural requirements in the Just Cause Laws. *Id.* at ¶¶ 72-75.[1] Plaintiffs' members have been forced to prepare to comply with the Just Cause Laws, including by creating new policies and training employees on new requirements. *Id.* at ¶ 70.

## III.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 & n.4 (1986). "Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal citation omitted). Barring that, the Court should review the legal questions, and grant summary judgment if the challenged action violates the law. *Celotex*, 477 U.S. at 322.

Here, there are no disputed facts regarding the content, purpose, and impact of the Just Cause Laws, so the Court can decide the case as a matter of law.

---

[1] Nor have fast-food employees themselves selected the SEIU as their representative. Thus, the Just Cause Laws and legislative process has usurped both sides of the collective bargaining process.

IV.     **ARGUMENT**

A.      **The NLRA Preempts the Just Cause Laws.**

Federal labor law preempts the Just Cause Laws.  Specifically, the NLRA preempts the Just Cause Laws under *Machinists*, 472 U.S. at 146, because the Laws interfere in the collective bargaining process in a subset of the fast-food industry, attempting to legislate obligations for employers that the NLRA intended to leave unregulated and the subject of bargaining.

Federal preemption principles arise from the Supremacy Clause of the U.S. Constitution, which provides that the "Laws of the United States . . . shall be the supreme Law of the Land." U.S. Const. art. VI.  Indeed, federal courts have long recognized a cause of action in equity to prohibit the enforcement of state and local law that runs afoul of the Supremacy Clause.  *See Friends of the E. Hampton Airport, Inc. v. Town of East Hampton*, 841 F.3d 133, 144 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2295 (2017); *see also* 42 U.S.C. § 1983; *Ex parte Young*, 209 U.S. 123, 155-63 (1908).  Thus, when local laws run counter to federal labor laws, federal law supersedes those conflicting local laws.

The NLRA preempts state and local laws regulating activities that Congress intended to be left unregulated and thus subject to the natural "balance of power between labor and management expressed in our national labor policy."  *Machinists*, 427 U.S. at 140, 146.  Where Congress intentionally left conduct to "the free play of economic forces," localities may not regulate.  *Id.*

The Just Cause Laws blatantly interfere in labor-management relations and the collective bargaining process by imposing on Targeted Fast-Food Employers requirements that Congress left open to achieving, if at all, only through the free play of economic forces: in other words through negotiating a collective bargaining agreement ("CBA").  Eliminating at-will employment and requiring elaborate disciplinary procedures for hours reductions, terminations, and layoffs self-evidently gives "workers the equivalent of the kind of benefit that unions typically seek."  SOUF

¶ 83 (Battaglia Decl. Ex. 8).  Indeed, the explicit goal of the Just Cause Laws' sponsor (and the Laws' effect) is to provide what a union provides and impose typical CBA terms on Targeted Fast-Food Employers.  *Id.* at ¶ 24.

Moreover, the Laws go far beyond removing "economic weapons" from management or labor, *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 614 (1986); they pre-determine the outcome of the war by imposing the key aspects of CBAs on a certain subset of employers without any bargaining at all (and without the concessions that an employer would extract in exchange).  "Issues of hiring and firing are often central to CBA negotiations," and the NLRA "intended to allow the parties to resolve [such] matters without the unsettling effect of state regulation."  *Bassette v. Stone Container Corp.*, No. 89-33, 1992 WL 613289, at *3 (D. Mont. Oct. 9, 1992), *aff'd*, 25 F.3d 757 (9th Cir. 1994) (imposing "'good cause' requirement without negotiation or agreement"—in that case, where negotiating parties reached impasse—would "trivialize the very freedom of contract that is a fundamental policy of the NLRA").

Laws, like those at issue here, dictating substantive terms of employment survive *Machinists* preemption only if they impose "minimum labor standards" that do "not intrude upon the collective-bargaining process."  *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 7 (1987).  Minimum labor standards must "affect union and nonunion employees equally, and neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA."  *Metro. Life Ins. Co. v. Massachusett*s, 471 U.S. 724, 755 (1985).  Permissible minimum labor standards do not "have any but the most indirect effect on the right of self-organization."  *Id.*; *520 S. Mich. Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1127, 1129-30 (7th Cir. 2008).  In contrast, requirements that frustrate the "objective of allowing the bargaining process 'to be controlled by the free-play of economic forces'" are preempted. *Chamber of Commerce v. Bragdon*, 64 F.3d

9

497, 501 (9th Cir. 1995); *Shannon*, 549 F.3d at 1136-37 (substantive requirements are not "minimum labor standards" if they are "incompatible with the goals of the NLRA"—i.e., if they lead to unequal bargaining power by, for example, shifting burdens of proof or requiring new tribunals for disputes).  The Just Cause Laws are not minimum labor standards for three reasons.

First, the Just Cause Laws are not generally applicable.  Laws that target workers within a particular industry are unlikely to constitute minimum labor standards.  *See Shannon*, 549 F.3d at 1139 (concluding that a law "is not a law of general application" because it "applies to one occupation, in one industry, in one county").  A law "which is not of general application, but targets particular workers in a particular industry . . . affects the bargaining process in a way that is incompatible with the general goals of the NLRA." *Bragdon*, 64 F.3d at 504.  Even if under-inclusive laws apply to union and non-union employees equally on their face, such "narrow application equates more to a benefit for a bargaining unit than an individual protection." *Shannon*, 549 F.3d at 1133; *see Bldg. Owners & Managers Ass'n of Chi. v. City of Chi.*, No. 19-7212, 2021 WL 168966, at *2 (N.D. Ill. Jan. 19, 2021) (contrasting narrowly targeted law focused on one industry, which was not a minimum labor standard, with a law that applied to all employees in all seven industries where the reason for the law was present, which was a minimum labor standard).

The Just Cause Laws clearly are under-inclusive.  They apply only to fast-food chains that have at least 30 locations nationwide.  That is a small subset (large national chains) of a subset (fast-food chains) of a subset (fast-food restaurants) of a single industry (restaurants).  The Laws' sponsor claimed that their purpose is protecting the jobs of "essential" workers who have worked through pandemic shutdowns and shouldered extra tasks such as sanitation.  SOUF ¶ 84 (Battaglia Decl. Ex. 9).  But fast-food employees in national fast-food chains are not the only "essential" workers who have worked during the pandemic and who are subject to at-will employment.  This

same rationale would apply to hotel, retail, healthcare, and (of course) other restaurant and fast-food employees.  The Just Cause Laws, however, only provide specific benefits for a specific bargaining unit—large national chain fast-food workers.

Second, the Just Cause Laws are "substantially more targeted invasion[s] of the bargaining process than" a typical minimum labor standard.  *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 86 n.8 (2d Cir. 2015).  For example, a law that dictates "the division of the total package that is paid in hourly wages directly to the worker and the amount paid by the employer in health, pension, and welfare benefits" is a "'much more invasive and detailed' interference with the collective-bargaining process" than a "minimum total compensation requirement" (such as a minimum wage).  *Id.* (quoting *Bragdon*, 64 F.3d at 502).  The "targeted invasion[s]" prohibited by *Machinists* include detailed conduct requirements and "changes to the burden of proof" in employee lawsuits.  *Id.* (discussing *Shannon*, 549 F.3d at 1134).  Where a law establishes "terms of employment that would be very difficult for any union to bargain for," it is "much more than a mere backdrop to negotiations" and is preempted.  *Shannon*, 549 F.3d at 1134.

The invasion of the bargaining process here is more of a targeted invasion than the laws distinguished in *Concerned Home Care Providers*, 783 F.3d at 86 n.8.  The Just Cause Laws "change[] the burden of proof" by requiring Targeted Fast-Food Employers to prove that any discharge was done for "just cause" or a "bona fide economic reason."  SOUF ¶ 57.  The Laws also require wholesale changes to Targeted Fast-Food Employers' procedures for layoffs, hours reductions, and terminations—including record-keeping, training, and progressive discipline SOUF ¶¶ 47, 54—and provide for mandatory arbitration at an employee's option.  SOUF ¶¶ 58-59.  These disciplinary and grievance procedures are nothing like minimum-wage or scheduling fairness laws; they impose detailed, sweeping requirements typical to CBAs.

Indeed, the Just Cause Laws are the first of their kind—similar requirements have been enacted in no other major American city.  SOUF ¶ 83 (Battaglia Decl. Ex. 8).  Until now, "just cause" has developed in the context of collective bargaining.  *See* Brand & Biren, *Discipline & Discharge in Arbitration* § 2 (3d ed. 2015) (most American jurisdictions adopted "the employment at-will doctrine in 1877 [and] [j]ust cause resurfaced in the 1930s when unions . . . began including just cause provisions in their collective bargaining agreements").  Further, "just cause" has been administered by third-party arbitrators under CBAs and is governed in that context by the well-developed "seven tests" of just cause, *see, e.g.*, *Paperworkers v. Misco, Inc.*, 484 U.S. 29, 34 n. 5 (1987)—part of a growing body of "common law" of "management and labor under collective bargaining agreements."  Elkouri & Elkouri, *How Arbitration Works* § 15.2.A.ii (8th ed. 2016).  But this standard is irrelevant to nonunion employees in at-will states.  *Id.* § 15.2.A.i ("just cause" limitation read into every CBA, but irrelevant in nonunion at-will context).  The Just Cause Laws' sponsor understood all this: the goal was to get fast-food workers "part of what a union provides," a "protection that has otherwise been available only to union members."  SOUF ¶ 24.  From the beginning, Lander understood that the "principle of 'just cause' is the keystone of the collective bargaining agreement" and "marks a sharp dividing line between union and nonunion or at-will workers."  *Id.* at ¶ 20.  Neutral observers likewise have recognized that the Laws "giv[e] workers the equivalent of the kind of benefit that unions typically seek."  Id. at ¶ 83 (Battaglia Decl. Ex. 8).[2]

That is just the type of law that violates *Machinists*.  When laws both target "particular workers in a particular industry" *and* are "developed and revised from the bargaining of others"—

---

[2] All this also means that the terms of the Just Cause Laws would be "very difficult" for any union to negotiate. *Shannon*, 549 F.3d at 1134.  Indeed, the City will be hard-pressed to find any CBA that provides for just-cause only termination without including *any* quid pro quo from the union.

i.e., packages are lifted from the averages of bargains actually struck by other employers and employees—they are not permissible minimum labor standards. *Bragdon*, 64 F.3d at 503-04. The Just Cause Laws are intended to lift terms from CBAs and apply them to the targeted employers.

Moreover, this targeted invasion in the bargaining process came in large part from SEIU 32BJ itself—as Lander's office engaged in a comprehensive, coordinated effort with 32BJ to draft the legislation. The undisputed facts show that 32BJ "pitched" and assisted in drafting the legislation in 2018 and 2019. SOUF ¶¶ 15-17. City Council staff readily incorporated edits from 32BJ's attorney Katchen Locke and Strategic Campaign Coordinator David Cohen. SOUF ¶ 21. In one exchange, Locke proposed new language on progressive discipline, and Lander approved it within hours. *Id.* Locke's involvement was so great as to raise objections from a N.Y. City Council attorney regarding his inclusion in meetings about the legislation, but Lander's staff "fought hard" to include him. *Id.* at ¶ 17. Lander described the sponsors of the bill as himself, SEIU-affiliated "Fast Food Justice, SEIU 32-BJ, and Council Member Adrienne Adams." *Id.* at ¶ 24.[3] An SEIU Local's Chief of Staff has admitted that these laws are "part of the union's sectoral strategy for organizing fast food workers." SOUF ¶ 38 (Battaglia Decl. Ex. 10). These undisputed facts reflect that the laws are a targeted fulfillment of the union's wish list for a limited set of workers *explicitly to aid unionization efforts*. They are not minimum labor standards.

Third, in practice, the Just Cause Laws affect union and nonunion employees differently. *See Metro. Life Ins.*, 471 U.S. at 755 (such laws are preempted by *Machinists*). They impose obligations that go to the heart of collectively bargained contracts but without requiring any agreement or negotiation process—or any quid pro quo. For example, in typical CBAs, when

---

[3] Indeed, these Laws were part of the SEIU's "campaign to win more stringent labor protections for workers like fast food employees who do not have collective bargaining agreements," which the 32BJ SEIU's president views as being "denied the dignity and respect they deserve for far too long." SOUF ¶ 83 (Battaglia Decl. Ex. 8).

employers agree to arbitration, there is a (judicially recognized) quid pro quo that the union and employees agree not to strike or impose a work stoppage regarding an arbitrable dispute. *See, e.g.*, *Boys Markets, Inc. v. Retail Clerks Union, Loc. 770*, 398 U.S. 235, 248 (1970) ("a no-strike obligation, express or implied, is the quid pro quo for an undertaking by the employer to submit grievance disputes to the process of arbitration"); *Will Poultry, Inc. v. Teamsters Loc. 264*, No. 13-1135, 2013 WL 6837547, at *4 (W.D.N.Y. Dec. 23, 2013) ("a strike to settle a dispute which a [CBA] provides shall be settled exclusively and finally by compulsory arbitration constitutes a violation of the agreement" even without a no-strike clause). Here, the Just Cause Laws require Targeted Fast-Food Employers to submit to arbitration at an employee's option—but with no corresponding no-strike obligation. Employers that have agreed to arbitration in a CBA are thus favored over employers that must arbitrate according to the Just Cause Laws.

This sort of imbalance violates *Machinists* because it pressures employers to enter into CBAs, interfering with the collective bargaining process, *Fort Halifax*, 482 U.S. at 7, and with "the NLRA's plan to leave certain areas unregulated," *Healthcare Ass'n of N.Y. State, Inc. v. Pataki*, 471 F.3d 87, 94 (2d Cir. 2006). Both Lander and SEIU leadership have admitted that the Laws are meant to unionize fast-food workers. SOUF ¶ 24 ("[W]hen fast-food workers started the Fight for $15, their demand was '$15 and a union,'" and now that they have $15 minimum wage, the Just Cause Laws provide conditions previously "available only to union members."); SOUF ¶ 38 (Battaglia Decl. Ex. 10) (SEIU leadership conceding the Laws are part of SEIU's "strategy for organizing fast food workers").

For these reasons, at least one court has held that imposition of a just cause requirement for terminations in the absence of a CBA would have an "untoward effect of imposing a contract term on the parties and thus altering incentives to negotiate." *Bassette*, 1992 WL 613289, at *3

14

(reasoning that a law with the effect of "guarantee[ing] employees a 'good cause' requirement without negotiation or agreement" would "trivialize the very freedom of contract that is a fundamental policy of the NLRA"). Just so here. The Just Cause Laws "shift the balance of power" with respect to discipline, termination, and layoff procedures "toward employees and unions," interfering in the bargaining process and creating improper incentives to unionize. *See Haw. Pac. Health v. Takamine*, No. 11-00706, 2012 WL 6738548, at *5 (D. Haw. Dec. 31, 2012). They are not minimum labor standards and are preempted by the NLRA.

### B.    The Just Cause Laws Violate the Dormant Commerce Clause.

Not only does the under-inclusiveness of the Just Cause Laws demonstrate that they are not generally applicable minimum labor standards, but the under-inclusiveness also violates the dormant Commerce Clause by discriminating against interstate commerce.

The Supreme Court has long held that the Commerce Clause contains a "negative implication" intended to prevent "'economic protectionism[,] that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-38 (2008) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273-74 (1988)). A law that discriminates against interstate commerce—either facially, purposefully, or in practical effect, *LensCrafters, Inc. v. Robinson*, 403 F.3d 798, 802 (6th Cir. 2005)—is subject to strict scrutiny. *Maine v. Taylor*, 477 U.S. 131, 138 (1986) ("[T]he burden falls on the State to demonstrate both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means[.]").

Although the Just Cause Laws rely on purportedly neutral criteria, they discriminate against interstate commerce in effect. A purely local restaurant—with one location in New York City— is wholly exempted from these laws. It is free to maximize its profits by discharging workers or reducing hours. A local fast-food restaurant need not maintain a progressive discipline policy and

does not bear the burden to prove that it discharged an employee for just cause.  Instead, the Just Cause Laws' severe and costly requirements apply only to targeted employers that are "part of a chain" that is "one of 30 or more establishments nationally."  SOUF ¶ 39.

Every employee who testified in support of the bill worked for a national chain restaurant. SOUF ¶ 31.  Similarly, the fact that the only opposition to the bill came from chains engaged in interstate commerce (*id.*) is a strong indication of the absence of political restraints, the hallmark of discrimination against interstate commerce.  *See Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 400 (9th Cir. 2015) (noting importance of whether burdened parties "have local representation").  Not only did no in-state restaurant chain oppose the law, but research has also failed to uncover any in-state restaurant chain that would be subject to the laws' requirements.  *See* SOUF ¶ 77. And even if such a chain existed, the dormant Commerce Clause does not permit discrimination against "out-of-state firms [even if] some in-state firms are also adversely affected." *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 298 F.3d 201, 214 (3d Cir. 2002).

The onerous requirements of the Just Cause Laws apply only to national restaurant chains (or franchisees of national restaurant chains) doing business in New York City but not to purely local restaurants.  This is the very definition of discrimination against interstate commerce: "[D]ifferential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."  *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994); *see also Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 351 (1977) (finding that a law discriminated against interstate commerce because of its "consequence of raising the costs of doing business in the North Carolina market for Washington apple growers and dealers, while leaving those of their North Carolina counterparts unaffected").

As discussed above, nothing in the legislative history of the Just Cause Laws justified

limiting the laws only to fast-food establishments that are part of national chains. All of the rationales offered in support of the laws apply equally to all fast-food employees, regardless of whether they work for large or small, state or local, restaurants.

Unlike the minimum wage ordinance addressed in *Int'l Franchise Ass'n, Inc. v. City of Seattle*, which eventually applied to all employers, the Just Cause Laws will not eventually apply to all restaurants, fast-food or otherwise, in New York City. 97 F. Supp. 3d 1256, 1263 (W.D. Wash. 2015), *aff'd but criticized*, 803 F.3d 389 (9th Cir. 2015). Similarly distinct is the challenge raised to the Seattle Ordinance, which concerned only the faster phase-in applying to large businesses: "Small businesses were given this extra time because they lack the same resources as large businesses and will face particular challenges in implementing the law." *Id.* The bill counted franchises as "large" employers if they were part of a chain that had more than 500 total employees. *Id.* at 1265. Here, in contrast, whether an entity is a franchise or a chain does not affect *when* it is subject to the Just Cause Laws—purely local restaurants will never be subject. Chain restaurants will be placed at a permanent disadvantage compared to their local competitors.

Also unlike the Seattle Ordinance, the Just Cause Laws do not use a restaurant's association with a chain as part of measuring its size and ability to bear financial burdens. Application of the Just Cause Laws depends only on the number of locations, a measurement independent of a restaurant's size or financial resources. For example, a franchise with 5 employees that is part of an interstate chain of 30 locations (each with 5 employees) would be subject to the Just Cause Laws, but a single local restaurant with 300 employees would not.

The targeting of interstate chain restaurants in the Just Clause Laws closely resembles the "formula restaurant" prohibition discussed in *Cachia v. Islamorada*, 542 F.3d 839, 843 (11th Cir. 2008). There, a local ordinance prohibited "formula restaurants," defined as:

> [A]n eating place that is one of a chain or group of three (3) or more existing establishments and which satisfies at least two of the following three descriptions: (1) has the same or similar name, tradename, or trademark as others in the chain or group; (2) offers any of the following characteristics in a style which is distinctive to and standardized among the chain or group . . . ; or (3) is a fast food restaurant.

*Id.* at 841. The Eleventh Circuit readily concluded that this ordinance had the practical effect of discriminating against interstate commerce:

> While the ordinance does not facially discriminate between in-state and out-of-state interests, its prohibition of restaurants operating under the same name, trademark, menu, or style is not evenhanded in effect, and disproportionately targets restaurants operating in interstate commerce.  The ordinance's prohibition therefore imposes more than an indirect burden on interstate restaurant operations, and has the practical effect of discriminating against interstate commerce.

*Id.* at 843. The only difference between the ordinance at issue in *Cachia* and the Just Cause Laws is that the Just Cause Laws impose significant additional costs on restaurants operating in interstate commerce rather than prohibiting them completely.  The discrimination is the same.

Because the Just Cause Laws have the practical effect of discriminating against interstate commerce, they are subject to what amounts to strict scrutiny.  *Legato Vapors, LLC v. Cook*, 847 F.3d 825, 830 (7th Cir. 2017) (citing *Maine*, 477 U.S. at 138).  "[O]nce a state law is shown to discriminate against interstate commerce either on its face or in practical effect, the burden falls on the State to demonstrate both that the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means."  *Maine*, 477 U.S. at 138.  The City cannot satisfy this strict standard.  The purpose of the statute would apply equally to workers employed by all fast-food restaurants in the City, and a generally applicable law would serve the same purpose through nondiscriminatory means. There is no justification for applying these onerous rules disproportionately to interstate chains.

In the alternative, the Just Cause Laws are invalid under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), because "the burden imposed on [interstate] commerce is clearly excessive in

relation to the putative local benefits." *Id.* at 142.  "[T]he extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id.*  There is no question that the Just Cause Laws burden interstate commerce by imposing costly regulations and a disproportionate burden on national restaurants (or restaurants doing business with national chains as franchisees). *See* SOUF ¶¶ 69-80.  And the local interest purportedly served by the ordinance— protecting fast-food workers—would be served equally by a law that applies to all restaurants and all fast-food workers (indeed, all front-line workers), whether or not those restaurants are purely local or part of a national chain.  The legislative history of the Just Cause Laws contains no justification for imposing these burdens only on interstate chains and exempting local restaurants. Because the burden on interstate commerce is clearly excessive in relation to local interests, it fails the dormant Commerce Clause under *Pike*.

### C.     The Just Cause Laws Violate New York Law of At-Will Employment.

As this Court has repeatedly recognized, "[u]nder New York law, absent an express agreement of fixed duration, an employment relationship is presumed to be at will, 'and may be freely terminated by either party at any time without cause or notice.'" *Colodney v. Continuum Health Partners, Inc.*, No. 03-7276, 2004 WL 829158, at *5 (S.D.N.Y. Apr. 15, 2004) (Cote, J.); *see Andrew v. J.P. Morgan Chase & Co.*, No. 18-4421, 2018 WL 4926440, at *2 (S.D.N.Y. Oct. 9, 2018) (Cote, J.), *aff'd*, 783 F. App'x 102 (2d Cir. 2019) (same).  At-will employment means "the employer has the right to discharge the employee without cause, and without being subject to inquiry as to his or her motives." *Mason v. AmTrust Fin. Servs., Inc.*, No. 19-8364, 2020 WL 6365448, at *4 (S.D.N.Y. Oct. 29, 2020) (Cote, J.) (alterations and citation omitted).

New York law presumes that all employment relationships are at-will. *Horn v. N.Y. Times*, 100 N.Y.2d 85, 92 (2003).  Thus, "under New York law as it now stands," employers have the

19

absolute right to terminate an employee at any time absent very limited exceptions: "a constitutionally impermissible purpose, a [statewide] statutory proscription, or an express limitation in the individual contract of employment." *Id.*[4]  In fact, the New York Court of Appeals has refused to recognize a tort for wrongful discharge because it would undermine at-will employment.  *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 301-02 (1983); *see Colodney*, 2004 WL 829158, at *6 ("New York neither recognizes a tort of wrongful discharge nor requires good faith in an at-will employment relationship.").  *Murphy* also explained that any "significant change in our law" altering at-will employment *must come through the State Legislature*, if at all. 58 N.Y.2d at 301-02; *see Sabetay v. Sterling Drug*, 69 N.Y.2d 329, 336 (1987) ("significant alteration of employment relationships . . . is best left to the Legislature because stability and predictability in contractual affairs is a highly desirable jurisprudential value").

The City's Just Cause Laws contravene state law by refusing to let "an employer's right at any time to terminate an employment at will remain[] unimpaired." *Horn*, 100 N.Y.2d at 92. Requiring "just cause" or a "bona fide economic reason" before any termination is anathema to New York's policy that employees may be terminated "for cause or for no cause whatsoever." *Myers v. Hirst*, No. 09-4436, 2011 WL 116142, at *4-5 (S.D.N.Y. Jan. 13, 2011) (Cote, J.).

New York State law establishing "at-will" employment forbids the City's prohibition on at-will employment for the Targeted Fast-Food Employers in two ways: (1) state common law favoring at-will employment preempts local laws to the contrary under New York State preemption principles, which closely track federal preemption; and (2) New York Constitution article IX, section 2(c) makes it unconstitutional for local governments to adopt laws "inconsistent with … any general law" of the State—which includes New York's "at-will" law.

---

[4] Absent an express contract, employees may be terminated under New York law for "any nondiscriminatory reason." *Carter v. Rosenberg & Estis, P.C.*, No. 95-10439, 1997 WL 299398, at *2 (S.D.N.Y. June 5, 1997) (Cote, J.).

First, this targeted revocation of at-will employment is preempted.  New York State law preempts local laws similar to how federal law preempts state laws.  *See Mayor of New York v. Council of New York*, 780 N.Y.S.2d 266, 273 (N.Y. Sup. Ct. 2004) ("New York law recognizes three grounds for state preemption of local law, which roughly parallel the categories of federal preemption: express preemption, field preemption and conflict preemption.").  Under conflict preemption, local laws addressing the same subject matter as state laws may be preempted if they "prohibit[] conduct which the State law . . . considers acceptable."  *Jancyn Mfg. Corp. v. Suffolk Cty.*, 71 N.Y.2d 91, 96-97 (1987).  Just as "federal common law preempts state law," *City of New York v. Chevron Corp.*, 993 F.3d 81, 95 (2d Cir. 2021), state common law preempts local law.  In *Chevron*, federal common law over interstate pollution preempted the City's attempt to sue interstate polluters under state nuisance law.  *Id.* at 91-92.  Similarly, the State's common law of at-will employment (absent Statewide legislation or a contractual agreement) preempts this local attempt to forbid at-will employment—a clear conflict with State common law.

Second, the Just Cause Laws are ultra vires due to the same at-will common law.  The New York Constitution establishes municipal home rule in New York but expressly removes the ability of local governments to adopt laws that are "inconsistent with the provisions of . . . any general law."  N.Y. CONST., art. IX, § 2(c).  The New York law favoring at-will employment is a "general law" because it, "in terms and in effect[,] applies alike to all . . . villages."  *Id.*, art. IX § 3(d).

The Just Cause Laws are impermissibly "inconsistent" with State law on at-will employment.  Not only do they "impose[] additional restrictions over and above" State restrictions in a way that inhibits the purposes of State law, *McDonald v. N.Y.C. Campaign Fin. Bd.*, 40 Misc. 3d 826, 832-33 (N.Y. Sup. Ct. 2013), *aff'd as modified*, 117 A.D.3d 540 (1st Dep't 2014) (local law increasing minimum wage forbidden), but they explicitly demand the opposite of State law.

21

The State law is that employers may terminate employees for any reason using their business judgment without being second guessed by the government, but the Just Cause Laws now require sufficient "just cause."  State law presumes all employees are at-will absent an express agreement, but the Just Cause Laws forbid certain employers from entering or enforcing at-will contracts.

The Just Cause Laws are "inharmonious with the general laws of the State"—and are not substantially related to a legitimate local purpose, i.e., a concern only applicable to that locality and not the State as a whole.  *McDonald*, 965 N.Y.S.2d at 825.  They are thus inconsistent with State law and unconstitutional, and thus beyond the City's authority to enact and enforce.

### D.     The Just Cause Laws' Mandatory Arbitration Provision Is Illegal.

The Supreme Court of the United States repeatedly has emphasized "that arbitration 'is a matter of consent, not coercion.'" *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1415 (2019) (citation omitted). The "first principle that underscores all of our arbitration decisions" is that "[a]rbitration is strictly a matter of consent."  *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 299 (2010).  Under the Federal Arbitration Act ("FAA"), arbitrators "derive their 'powers from the parties' agreement to forgo the legal process and submit their disputes'" to arbitration.  *Lamps Plus*, 139 S. Ct. at 1415-16 (citation omitted).  The Just Cause Laws contravene this first principle by coercing employers to participate in arbitration at an employee's election, regardless of whether the employer consents. Such a requirement cannot be harmonized with the FAA.[5]

These principles apply with particular force to labor arbitrations, of the type imposed by the Just Cause Laws: "No obligation to arbitrate a labor dispute arises solely by operation of law.

---

[5] Moreover, if a fast-food employer and employee voluntarily enter into an arbitration agreement, the FAA requires that agreement to be enforced, regardless of the City's preferred form of arbitration.  The Supreme Court has squarely held, for example, that a state cannot compel a party to participate in classwide arbitration—as the Just Cause Laws attempt—when the party has only agreed to arbitration on an individual basis.  *See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 351-52 (2011) ("[A] party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so.").

The law compels a party to submit his grievance to arbitration only if he has contracted to do so." *Gateway Coal Co. v. United Mine Workers of Am.*, 414 U.S. 368, 374 (1974). "The first principle gleaned from the [*Steelworkers*] *Trilogy* is that 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *AT & T Techs., Inc. v. Comm'cns Workers of Am.*, 475 U.S. 643, 648 (1986) (citation omitted). The Just Cause Laws—which attempt to compel arbitration between employers and employees on topics that would ordinarily be the subject of collective bargaining—are thus contrary to federal law, which requires that arbitration occur as a matter of consent.

The compulsory arbitration provision also violates New York law. The New York Constitution guarantees the right to trial by jury: "Trial by jury in all cases in which it has heretofore been guaranteed by constitutional provision shall remain inviolate forever." N.Y. CONST. art. I, § 2. This guarantee includes "all cases afforded a jury trial under the common law prior to 1777 and all cases to which the Legislature extended a right to a jury trial prior to 1894." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State*, 550 N.E.2d 919, 921 (N.Y. 1990) (tracing history of New York constitutional guarantees). Whether a jury trial was required prior to 1777 turned on the form of relief: "[A] jury trial was required if the nature and substance of the relief requested was legal; if the relief demanded was equitable, there was no right to a jury trial." *Id.*

The Just Cause Laws expressly provide that an arbitrator may award "compensatory damages" SOUF ¶ 68, a classic remedy at law. *See, e.g.*, *Appel v. Goldberg*, 43 Misc. 3d 1221(A), 992 N.Y.S.2d 157 (N.Y. Sup. Ct. 2014) ("[P]laintiff has elected a remedy at law by seeking compensatory damages."). This general entitlement to "compensatory damages" distinguishes the Just Cause Laws from other statutes that permit only narrow, equitable monetary recovery. *See Taylor v. State*, 160 Misc. 2d 120, 125, 608 N.Y.S.2d 371, 375 (N.Y. Ct. Cl. 1994) ("A distinction

23

must be drawn between compensatory damages such as permitted under the Human Rights Law, specifically Executive Law § 297(4)(c)(iii), and 'lost wages, benefits and other remuneration' under Labor Law § 740(5) and Civil Service Law § 75–b(3)(c).").

In *Motor Vehicle Manufacturers*, the Court of Appeals rejected a challenge to compulsory arbitration because that statute (unlike the Just Cause Laws) provided only for equitable remedies:

> The Lemon Law refund remedy is an action seeking a rescission and restoration of the status quo ante, similar to an action for restitution, and is equitable in nature. It would not have been triable by jury under the common law. Accordingly, plaintiffs are not entitled to a jury trial under article I, § 2 of the New York Constitution[.]

550 N.E.2d 919, 922 (citations omitted). Here, the remedy is an action seeking "compensatory damages," which would have been triable by jury under the common law. As a result, employers are entitled to a jury trial under article I, section 2 of the New York Constitution, and the compulsory arbitration provisions of the Just Cause Laws deprive them of this right.[6]

In addition, the compulsory arbitration provisions impermissibly diminish the jurisdiction of the New York Supreme Court by allowing disputes to be heard by private arbitrators. Article VI, section 7(a) of the New York Constitution provides that "[t]he supreme court shall have general original jurisdiction in law and equity." This award of jurisdiction is not absolute: the New York State Legislature has the "power to alter and regulate the jurisdiction and proceedings in law and in equity." N.Y. Const., art. VI, § 30; *see Motor Vehicle Mfrs.*, 550 N.E.2d at 923 ("[The State Legislature] may award jurisdiction to other tribunals[.]"). In *Motor Vehicle Manufacturers*, the compulsory arbitration provision enacted by the State Legislature permissibly altered and regulated proceedings by providing that the Supreme Court would review an arbitrator's decision rather than deciding an issue in the first instance. *Id.*

But unlike the New York State Legislature, local governments have no authority to alter

---

[6] Parties may agree to waive their right to a jury or agree to arbitrate, but local law cannot remove the jury right.

and regulate the jurisdiction and proceedings of the Supreme Court.  They "are prohibited from implementing local laws which affect the jurisdiction of the courts":

> The New York Constitution limits a local government's power to interfere with the Legislature's authority to define the jurisdiction of the courts. . . . [L]ocal governments['] [power] . . .  is tempered by New York Constitution article IX, § 3(a)(2), which provides that "[e]xcept as expressly provided, nothing in this article shall restrict or impair any power of the legislature in relation to . . . [t]he courts as required or provided by article VI of this constitution."  As discussed above, New York Constitution article VI grants the Legislature certa(in powers to regulate the jurisdiction of the courts). . . . [L]ocal governments are prohibited from implementing local laws which affect the jurisdiction of the courts.

*Stoffer v. Dep't of Pub. Safety of Huntington*, 77 A.D.3d 305, 316 (2d Dep't 2010) (citations omitted).  For this reason, in *Stoffer* the Appellate Division held that the Town of Huntington could not create an "Accessory Apartment Bureau" to "adjudicate a violation of the Town Code . . . and to revoke the petitioners' accessory apartment permit."  *Id.*; *see also Greens at Half Hollow, LLC v. Town of Huntington*, 15 Misc. 3d 415, 421, 831 N.Y.S.2d 649 (N.Y. Sup. Ct. 2006) ("[T]hus the [l]ocal [l]aw passed by the Town creating the ZVB takes upon itself both the jurisdiction and the powers to adjudicate claims involving building violations that the State Legislature firmly placed within the District Court system.").

Unlike the New York State Legislature, the New York City Council has no constitutional authority to diminish the jurisdiction of the courts or regulate their proceedings by requiring that cases be heard by a private arbitrator before being heard in court.  For all these reasons, the Just Cause Laws' compulsory arbitration provisions are impermissible.

## V.    CONCLUSION

For each of these independent reasons, the Just Cause Laws violate federal or state law.  No facts are in dispute, so Plaintiffs respectfully request that the Court grant the motion for summary judgment, declare the laws invalid, and enjoin their enforcement.

Dated: July 20, 2021

Respectfully submitted,

*/s/ Leni D. Battaglia*

Leni D. Battaglia
Samuel S. Shaulson
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY  10178
T: 212-309-7177
leni.battaglia@morganlewis.com
sam.shaulson@morganlewis.com

William R. Peterson
*application to appear pro hac vice pending*
Morgan, Lewis & Bockius LLP
1000 Louisiana Street, Suite 4000
Houston, TX  77002
T: 713-890-5188
william.peterson@morganlewis.com

James D. Nelson
*application to appear pro hac vice pending*
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC  20004
T: 202-739-5411
james.nelson@morganlewis.com

Angelo I. Amador
*Admitted pro hac vice*
Restaurant Law Center
2055 L Street, NW
Seventh Floor
Washington, DC  20036
T: 202-492-5037
aamador@restaurant.org