# Exhibit 1

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

RESTAURANT LAW CENTER and
NEW YORK STATE RESTAURANT
ASSOCIATION,

                Plaintiffs,

v.

CITY OF NEW YORK and LORELEI SALAS, in
her official capacity as Commissioner of the NEW
YORK CITY DEPARTMENT OF CONSUMER
AND WORKER PROTECTION,

                Defendants.

Case No.
21-CV-04801 (DLC)

## [PROPOSED] BRIEF OF *AMICI CURIAE*
## NATIONAL EMPLOYMENT LAW PROJECT, *ET AL.*

# TABLE OF CONTENTS

STATEMENT OF INTEREST OF *AMICI CURIAE* ..................................................................... 1

PRELIMINARY STATEMENT ................................................................................................ 4

ARGUMENT ............................................................................................................................ 5

I.   THE NEW YORK CITY COUNCIL HAD A SOUND LEGAL AND POLICY BASIS FOR FOCUSING ON PROTECTING FAST FOOD WORKERS AT LARGE CHAINS WITH THE NEW JUST CAUSE LAWS AS THERE WAS SIGNIFICANT EVIDENCE THAT UNFAIR FIRINGS ARE COMMON IN THE INDUSTRY AND HAVE WIDESPREAD, HARMFUL EFFECTS ON WORKERS AND FAMILIES. .............................................................................. 5

    A.  Unfair Firings are Common in New York City's Fast Food Industry and Have Wide-spread, Harmful Effects. ...................................................................................................... 5

    B.  National Evidence Confirms The Widespread Harms Caused by Unfair Firings and The Political Popularity of Just Cause Legislation. .......................................................... 6

    C.  It Is Common for Legislation to Start by Addressing Problems Presented by Specific Industries and by Large Employers – as New York Has Done Repeatedly for the Fast Food Industry. ................................................................................................................... 7

II.  BLACK AND LATINX NEW YORKERS ARE HURT THE MOST BY UNFAIR FIRINGS AND WILL BENEFIT FROM NEW YORK CITY'S JUST CAUSE LAWS. ............................... 9

III. NEW YORK CITY'S JUST CAUSE LAWS MAKE IT MORE REALISTIC FOR WHISTLEBLOWERS TO SPEAK UP AND FOR WORKERS TO ENFORCE EMPLOYMENT AND CIVIL RIGHTS LAWS, IMPROVING JOB STANDARDS. ........................................... 10

IV. NEW YORK CITY'S JUST CAUSE LAWS ARE LIKELY TO SPUR MORE EFFICIENT HIRING AND MANAGEMENT PRACTICES AND NOT ADVERSELY AFFECT LABOR MARKETS OR ECONOMIC INNOVATION. .......................................................................... 11

V.  THE NEW YORK CITY COUNCIL'S DECISION TO DELEGATE SOME ADJUDICATORY RESPONSIBILITY TO ARBITRATORS WITH EXPERTISE IN JUST CAUSE WAS APPROPRIATE, AND DOES NOT VIOLATE THE FEDERAL ARBITRATION ACT, THE NEW YORK STATE CONSTITUTION'S RIGHT TO JURY TRIAL, OR THE JURISDICTION OF THE STATE COURTS. .............................................................................. 13

    A.  The Federal Arbitration Act Regulates Agreements Between Parties to Arbitrate – and Has No Applicability in The Absence of Such Agreements ................................................. 13

    B.  The New York Constitution's Right to Jury Trial Does Not Restrict State or Local Governments' Ability to Provide for Non-Jury Trial Enforcement When They Create New Causes of Action That Did Not Exist at Common Law ........................................................ 15

C. State or Local Governments' Providing Options for Non-Court Enforcement Does Not Trench on The Constitutional Jurisdiction of New York's State Courts. ............................... 19

CONCLUSION ............................................................................................................ 21

# **TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page(s)**

*AT & T Techs., Inc. v. Commc'ns Workers of Am.*,
    414 U.S. 643 (1986) ..............................................................................................14

*Bracker v. Cohen*,
    612 N.Y.S.2d 113 (1st Dep't 1994) ......................................................................20

*Bryer v. New York City Comm'n on Human Rights*,
    672 N.Y.S.2d 714 (1st Dep't 1998) ......................................................................16

*Flacke v. Onondaga Landfill Sys., Inc.*,
    507 N.E.2d 282, 69 N.Y.2d 355 (N.Y. 1987) ......................................................16

*Framboise Pastry Inc. v. New York City Comm'n on Human Rights*,
    30 N.Y.S.3d 49 (1st Dep't 2016) ..........................................................................16

*Garcia v. Chipotle Mexican Grill*,
    2019 WL 358503 (S.D.N.Y. Jan. 29, 2019) .........................................................15

*Gateway Coal Co. v. United Mine Workers of Am.*,
    414 U.S. 368 (1974) ..............................................................................................14

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
    561 U.S. 287 (2010) ..............................................................................................14

*Greens at Half Hallow, LLC v. Town of Huntington*,
    831 N.Y.S.2d 649 (N.Y. Sup. Ct. 2006) ..............................................................21

*Int'l Franchise Ass'n v. City of New York*,
    148 N.Y.S.3d 28 (1st Dep't 2021) ..........................................................................8

*Lamps Plus, Inc. v. Varela*,
    139 S. Ct. 1407 (2019) ..........................................................................................14

*Matter of Luria*,
    313 N.Y.S.2d 12, 63 Misc.2d 675 (N.Y. Surr. Ct. 1970) ...............................17, 18

*McHugh v. Santa Monica Rent Control Bd.*,
    777 P.2d 91 (Cal. 1989) ........................................................................................19

*Motor Vehicle Mnfrs. Ass'n v. State*,
    550 N.E.2d 919 (N.Y. 1990).............................................15, 16, 17, 19, 20

*Nat'l Rest. Ass'n v. Comm'r of Labor*,
    34 N.Y.S.3d 232, 141 A.D.3d 185 (3d Dep't 2016) ...............................................8

*State Farm Mut. Auto. Ins. Co. v. Broadnax*,
   827 P.2d 531 (Colo. 1992) ............................................................14

*In re Stoffer v. Dep't of Pub. Safety*,
   907 N.Y.S.2d 38, 77 A.D.3d 305 (2d Dep't 2010) ...............................21

**Constitutions and Statutes**

N.Y. Const., art. I, § 2...........................................................................15, 19

9 U.S.C. § 2 (Federal Arbitration Act)....................................................5, 13

N.Y. CPLR Article 78............................................................................16, 20

N.Y. Comp. Codes R. & Regs. tit. 12, §§ 146-1.2, 146-3.13 .......................7

N.Y. Gen. Bus. Law § 198-a(k) (Lemon Law)............................................14

N.Y. Exec. Law §§ 297–298 (New York State Human Rights Law)............16

N.Y. Lab. Law § 652 ....................................................................................8

N.Y.C. Admin. Code § 8-101 *et seq.* (New York City Human Rights Law) ........................15, 20

N.Y.C. Admin. Code §§ 20-12 *et seq.* ………………………………………………8

N.Y.C. Admin. Code § 20-1273 ...................................................................19

N.Y.C. Admin. Code § 22-505 ......................................................................8

N.Y.C. Admin. Code §§ 20-1271-75 (New York City's Just Cause Laws) ........................ *passim*

N.Y.C. Local Law No. 149 ............................................................................8

Colo. Rev. Stat. §§ 10-4-701 to 10-4-726....................................................14

Mass. Gen. Laws ch. 90, §§ 7N¼(3)(A)(iii) & 7N½(6) ................................14

**Other Authorities**

Kate Andrias & Alexander Hertel-Fernandez, Roosevelt Institute, *Ending At-Will Employment: A Guide for Just Cause Reform* (2021), https://rooseveltinstitute.org/wp-content/uploads/2021/01/RI_AtWill_Report_202101.pdf...................12

Robert C. Bird & John D. Knopf, *Do Wrongful-Discharge Laws Impair Firm Performance?*, 52 J. L. & Econ. 197, 211-12, 218-19 (2009) ..................12

Center for Popular Democracy, National Employment Law Project, Fast Food Justice & SEIU 32BJ, *Fired on a Whim: The Precarious Existence of NYC Fast-Food Workers* (2019),

iv

https://populardemocracy.org/sites/default/files/Just%20Cause%20Complete%20Final%20-%20Web.pdf. ……………………………………………………………..…5, 6

Eric Hoyt, Constraining Labor's 'Double Freedom': Revisiting the Impact Wrongful Discharge Laws on Labor Markets, 1979-2014, (Oct. 2018) (unpublished Ph.D. dissertation, University of Massachusetts), https://scholarworks.umass.edu/cgi/viewcontent.cgi?article=2396&context=dissertations_2 ........................................................................................................................................11

Brad Lander, *Local Law to Amend the Administrative Code of the City of New York, in Relation to Fast Food Employee Layoffs: Hearing on Intros. 1396 & 1415 Before the Comm. on Civ. Serv. and Lab.*, New York City Council (Feb. 13, 2020) …………………………………… 9

Ioana Marinescu, *Job Security Legislation and Job Duration: Evidence from the United Kingdom*, 27 J. Lab. Econ., 465 (2009)…………………………………………………..11

Ugo Okere, *et al.*, NELP & Raise the Floor All., *Secure Jobs, Safe Workplaces and Stable Communities: Ending At-Will Employment in Illinois*, (2021), https://www.nelp.org/publication/secure-jobs-safe-workplaces-stable-communities-ending-will-employment-illinois/ ........................................................................................................11

N.Y. State Dep't of Labor, *New York's Minimum Wage - Overview*, https://dol.ny.gov/minimum-wage-0..........................................................................................8

Irene Tung, *et al.*, NELP, *Just Cause Job Protections: Building Racial Equity and Shifting the Power Balance Between Workers and Employers* (2021), https://www.nelp.org/publication/just-cause-job-protections-building-racial-equity-and-shifting-the-power-balance-between-workers-and-employers/ ........................................6, 7, 9

<u>**STATEMENT OF INTEREST OF *AMICI CURIAE***</u>

*Amici* are a group of non-profit organizations that advocate for public policies to promote economic and worker justice in New York and nationally. *Amici* have an interest in the outcome of this case as they have seen firsthand from their members and the workers for whom they advocate that unfair firings and the at-will employment system are causing significant hardship for low-wage workers in New York and nationally. *Amici* have been making the policy and legal case for adoption of legislation like the New York City fast food Just Cause Laws in order to improve the lives of such workers and their communities by guaranteeing them greater economic security. *Amici* write not to repeat arguments made by the parties but rather to provide context and to share background on the beneficial policy impacts of the new Just Cause Laws and their implications for the parties' legal claims.

*Amicus* the National Employment Law Project ("NELP") is a non-profit legal research and advocacy organization with fifty years of experience advocating for low-wage and unemployed workers. NELP seeks to ensure that our nation upholds for all workers the promise of opportunity and economic security through work. At the federal, state, and local levels, NELP fights to create good jobs, expand access to work, and strengthen protections for low-wage workers and the unemployed. In recent years, NELP has focused increasingly on the problem of unfair firings – and on the impact that they have on workers and communities. NELP has documented how at-will employment and unfair firings hurt Black and brown workers in particular – and in response is a strong supporter of just cause employment protections.

*Amicus* Make the Road New York ("MRNY") is a non-profit membership-based community organization with over 24,000 members dedicated to promoting equal rights and economic and political opportunity for low-income New Yorkers. MRNY's Workplace Justice

team represents hundreds of low-wage immigrant workers each year to enforce their rights under workplace laws. Our clients routinely face arbitrary and unfair firings or reductions in hours. The resulting loss of income is devastating for working New Yorkers who are already struggling to pay rent and meet basic household needs, and it can be incredibly destabilizing for their families and communities. But even when our clients' employers have no justifiable reason for firing or disciplining them, we do not always have enough evidence of the employer's discriminatory intent to bring a successful claim under an anti-discrimination statute. Our experience has shown the overwhelming need for protections against these unjust firings.

*Amicus* the Center for Popular Democracy ("CPD") is a national organization dedicated to creating equity, opportunity and democracy in partnership with base-building partner organizations. CPD works closely with its affiliates and allies rooted in communities of low wage workers and the unemployed to support their advocacy for strong worker-protection policies and effective enforcement of those laws. The problem of unfair and arbitrary firings remains a significant burden for these workers and communities, which has led CPD to support efforts to adopt new protections such as New York City's Just Cause Laws.

*Amicus* A Better Balance is a national legal advocacy organization dedicated to promoting fairness in the workplace and helping employees meet the conflicting demands of work and family. A Better Balance is committed to helping workers care for their families without risking their economic security. In the wake of COVID, millions of women have left the workplace, many of them involuntarily, due to their need to provide care for their families. The Just Cause Laws will help ensure that all workers in the fast food industry in New York City will be treated fairly and will not be faced with job loss solely because of factors such as the need to care for their families.

*Amicus* the CUNY Urban Food Policy Institute is a research action center based at the City University of New York School of Public Health. Its mission is to provide evidence and policy analyses to inform equitable, healthy, and sustainable urban food policies in New York and other cities. The Urban Food Policy Institute has documented the link between job loss and significant, harmful health consequences, including anxiety, depression, stress, and other negative mental health outcomes.

*Amicus* the New York Taxi Workers Alliance ("NYTWA") is a membership-based, non-profit organization that was founded in 1998 with the purpose of seeking to improve the lives and working conditions of professional taxi and for-hire vehicle (FHV) drivers. While the NYTWA has successfully fought for and won the right to unemployment benefits for app-based FHV drivers in New York, these same drivers have remained subject to high levels of unfair and often unexplained terminations and are typically left without recourse to challenge these firings. The NYTWA supports the Just Cause Laws' aim of protecting other low-wage workers from the economic harm and instability caused by unfair and arbitrary job loss.

*Amicus* Community Voices Heard ("CVH") is a member-led, multi-racial organization principally comprised of women of color and low-income families in New York State. CVH tackles tough issues and builds power to secure racial, social and economic justice for all New Yorkers. Unfair and arbitrary firings cause serious hardship for CVH's members, which is why CVH supports policies like the new Just Cause Laws to protect workers from them.

*Amicus* the Workers Justice Project ("WJP") is a worker center that addresses the racial and economic injustice that day laborers, domestic workers and app-based delivery workers face. WJP does this by building collective power and creating solutions to the problems that workers experience on the job and in the communities where they live. WJP regularly sees the harmful

impact of unfair firings on low-wage workers and supports legislation like the new Just Cause Laws to protect them.

<strong><u>PRELIMINARY STATEMENT</u></strong>

After years of complaints from workers about the problem of unfair firings in the fast food industry and a pandemic during which fast food workers were a life line for many New Yorkers but risked losing their jobs when they spoke up about health hazards at work, the New York City Council enacted a pair of just cause laws, New York City Administrative Code §§ 20-1271-75 ("the Just Cause Laws"), to protect workers in this industry against unfair firings. In this *amicus* brief, we detail how the City Council had a sound legal and policy basis for acting to protect fast food workers at large chain restaurants with these new just cause protections. The harms that workers and their families suffer as a result of unfair firings in New York's fast food sector had been well-documented by workers and brought to the City Council's attention; national evidence confirms the harms to workers under the at-will employment system and the broad popularity of replacing it with just cause protections; and in focusing on large fast food chains, the Just Cause Laws built on existing city and state employment laws, which have similarly responded to employment problems at large fast food chains. We then explain how Black and Latinx New Yorkers are hurt the most by unfair firings and will benefit the most from the new Just Cause Laws – and how the just cause legislation will make it more realistic for workers to enforce their rights under our existing employment and civil rights laws, improving job standards across the fast food industry. Next, we discuss the evidence on the economic impact of just cause protections, which indicates that such laws are likely to spur more efficient hiring and management practices, and not adversely affect labor markets or economic innovation. Finally, we explain how the City Council's decision to allow workers the option of

enforcing the new Just Cause Laws through arbitration before arbitrators with expertise in just cause employment policy was appropriate and it does not violate the Federal Arbitration Act, the New York State Constitution's right to jury trial, or the jurisdiction of the state courts.

## **ARGUMENT**

**I.**     **THE NEW YORK CITY COUNCIL HAD A SOUND LEGAL AND POLICY BASIS FOR FOCUSING ON PROTECTING FAST FOOD WORKERS AT LARGE CHAINS WITH THE NEW JUST CAUSE LAWS AS THERE WAS SIGNIFICANT EVIDENCE THAT UNFAIR FIRINGS ARE COMMON IN THE INDUSTRY AND HAVE WIDESPREAD, HARMFUL EFFECTS ON WORKERS AND FAMILIES.**

The New York City Council had a sound legal and policy basis for adopting just cause protections for workers at large fast food chains as workers in that sector had been calling to the Council's attention the problem of unfair firings in their industry; national evidence confirms the widespread harms resulting from at-will employment and the broad popularity of replacing it with just cause protections; and the Just Cause Laws built on existing city and state laws that similarly responded to employment problems at large fast food chains.

> **A.**     **Unfair Firings are Common in New York City's Fast Food Industry and Have Wide-spread, Harmful Effects.**

The New York City Council adopted the Just Cause Laws after years of complaints by fast food workers about the harmful effects of unfair firings in their industry. A 2019 report, *Fired on a Whim: The Precarious Existence of NYC Fast-Food Workers*, detailed conditions in the industry based on a survey of more than 500 New York City fast food workers. *See* CPD, NELP, Fast Food Justice & SEIU 32BJ (2019), https://populardemocracy.org/sites/default/files /Just%20Cause%20Complete%20Final%20-%20Web.pdf. Fifty percent of the workers surveyed reported that they had been fired, laid off, or compelled to quit a fast food job under unfair circumstances – and of those, twenty five percent reported experiencing multiple such firings. *Id.*

at 3. Fifty eight percent reported having their hours cut dramatically at least once, with the average reduction reported being fourteen hours – which translates to the loss of one third of a full-time worker's income. *Id.* Sixty five percent of workers reported that on at least one occasion they were not provided even a basic explanation for their termination. *Id.*

The report described the economic hardship, fear, and instability that result when the paycheck that a worker relies on one day is gone the next. Sixty two percent of fast food workers reported that, when they lost their jobs, they faced serious financial hardship, such as food insecurity, housing instability, or loss of resources to pay for childcare. *Id.* Others faced eviction, were forced to move, or had to drop out of school. *Id.* These impacts have cascading effects on the families and communities whom these workers support, causing far-reaching hardship and dislocation.

B.    **National Evidence Confirms The Widespread Harms Caused by Unfair Firings and The Political Popularity of Just Cause Legislation.**

National data reinforces the findings of the New York fast food workers' survey about the prevalence and harmful effects of unfair firings – and shows that just cause protections are broadly popular with the public. A 2021 survey of 3,000 workers across the U.S. found that forty seven percent reported being fired for no reason or a bad reason at some point. Irene Tung, *et al.*, NELP, *Just Cause Job Protections: Building Racial Equity and Shifting the Power Balance Between Workers and Employers*, 3 (2021) https://www.nelp.org/publication/just-cause-job-protections-building-racial-equity-and-shifting-the-power-balance-between-workers-and-employers/ ("NELP Just Cause Report"). Other national data confirms the significant harmful impact of such job loss. When they lose their jobs, thirty eight percent of workers are out of work for at least three months – and during the Great Recession of 2007-2009, it was fifty percent. *Id.*

Polling shows that overwhelming majorities of Democratic, Republican and Independent voters all support replacing at-will employment with just cause protections. For example, in a 2021 poll, seventy one percent of voters in battleground congressional districts – including sixty seven percent of Republicans and seventy five percent of Democrats – expressed support for adopting just-cause laws. *Id.* at 21.

C. **It Is Common for Legislation to Start by Addressing Problems Presented by Specific Industries and by Large Employers – As New York Has Done Repeatedly for The Fast Food Industry.**

Plaintiffs argue that the Just Cause Laws' focus on employees at large fast food chains with more than thirty locations nationwide is unfair and illegal. It is common, however, for legislation to start by addressing problems presented by specific industries with poor working conditions and by large employers in those industries. New York has done this repeatedly for fast food and other sectors – and often, after testing a policy in a specific industry, has then expanded it to protect workers in other industries.

The new Just Cause Laws build on existing employment laws adopted by New York City and New York State that have similarly regulated large chain employers in the fast food industry. Those laws started with New York State's $15 minimum wage for fast food workers, which the state adopted in 2015. As with the Just Cause Laws, the fast food $15 minimum wage was adopted after workers in the fast food industry brought forward evidence that low pay was causing substantial hardship for workers in the sector. Like the new Just Cause Laws, the $15 minimum wage applied to fast food chains with more than thirty locations nationwide. *See* N.Y. Comp. Codes R. & Regs. tit. 12, §§ 146-1.2, 146-3.13. The fast food $15 minimum wage was challenged by opponents in court, and the Appellate Division upheld it, rejecting, among other things, charges that it discriminated against out-of-state companies in violation of the dormant

commerce clause. *Nat'l Rest. Ass'n v. Comm'r of Labor*, 34 N.Y.S.3d 232, 141 A.D.3d 185, 194 (3d Dep't 2016). Moreover, once the feasibility of the $15 minimum wage was successfully demonstrated in New York's fast food industry, the legislature then expanded it to workers in all industries. *See* N.Y. Lab. Law § 652, *see also* N.Y. State Dep't of Labor, *New York's Minimum Wage - Overview*, https://dol.ny.gov/minimum-wage-0.

Next, the City Council adopted the New York City Fair Workweek Law, which established fair scheduling standards, and which similarly applied to large fast food chains with more than thirty locations nationwide, as well as to certain retailers. *See* N.Y.C. Admin. Code §§ 20-12 *et seq*. The Appellate Division this year upheld that law against legal challenge. *See Int'l Franchise Ass'n v. City of New York*, 148 N.Y.S.3d 28 (1st Dep't 2021).

It is common for states and cities to adopt industry-specific legislation to address employment conditions in specific sectors, and it is equally common to focus such standards on large employers in the sector – who typically are best equipped to comply with new regulatory standards. Examples include New York City's Displaced Building Service Workers Retention Act, N.Y.C. Admin. Code § 22-505 (regulating the building services industry and exempting small residential and commercial buildings), and the New York City Taxi and Limousine Commission's special licensing requirements for High-Volume For Hire Services, N.Y.C. Local Law No. 149 (2018) (regulating high-volume operators like Uber and Lyft in the for-hire transportation industry). Both establish employment standards for specific industries and apply only to large companies.

With the Just Cause Laws, the City Council built on these successful precedents when, after reviewing evidence about the problem of unfair firings in the industry, it established just cause protections for workers at large fast food chains. In doing so, it reasonably concluded that

larger firms in the industry would be best positioned to comply with the new standards. And as with other laws like the $15 minimum wage – which was tested initially in the fast food industry and then expanded to all industries – City Council members have already expressed their desire to ultimately expand the Just Cause Laws to all workers in New York City. *See A Local Law to Amend the Administrative Code of the City of New York, in Relation to Fast Food Employee Layoffs: Hearing on Intros. 1396 & 1415 Before the Comm. on Civ. Serv. and Lab.*, New York City Council, at 13 (Feb. 13, 2020) (statement of Council Member Brad Lander).

## II. BLACK AND LATINX NEW YORKERS ARE HURT THE MOST BY UNFAIR FIRINGS AND WILL BENEFIT FROM NEW YORK CITY'S JUST CAUSE LAWS.

An important function of the new Just Cause Laws is protecting Black and Latinx workers – who make up a disproportionate share of the fast food workforce. They suffer the greatest harm after unfair firings and will benefit disproportionately from the new protections.

For example, Black and Latinx workers are more likely than white workers to face an extended period of unemployment after losing their jobs, even when the economy is strong – and even more so during recessions. NELP Just Cause Report, at 4. Black and Latinx households also have less savings or family wealth to fall back on during periods of extended unemployment, making the impact of joblessness more severe. *Id.*

In the workplace, the at-will system also amplifies the power imbalance between employers and individual workers. This hurts all workers, but especially those who have the least power in the labor market and who are most often segregated into dangerous and lower-paying jobs – such as Black and Latinx workers.

For example, the kinds of unfair decision-making that at-will employment invites can exacerbate discrimination in discipline and firings. Unfortunately, the narrow definition of what

qualifies as illegal racial discrimination under our civil rights laws often does not capture many kinds of racially-linked unfair treatment that workers of color face on the job. A just cause system under which employers are required to provide a good reason and a fair process before discharging workers will help address these inequities in the labor market and workplace that Black and Latinx workers have long faced.

### III. NEW YORK CITY'S JUST CAUSE LAWS MAKE IT MORE REALISTIC FOR WHISTLEBLOWERS TO SPEAK UP AND FOR WORKERS TO ENFORCE EMPLOYMENT AND CIVIL RIGHTS LAWS, IMPROVING JOB STANDARDS.

The new Just Cause Laws will also improve workers' ability to enforce their rights under existing employment laws, such as our laws prohibiting discrimination and wage theft and laws protecting whistleblowers from retaliation.

Our nation's employment laws depend on workers to report legal violations, such as discrimination, wage theft, or health and safety issues. When workers come forward to raise such concerns, however, they risk being fired under our at-will employment system. While our employment laws sometimes prohibit such retaliation, those protections are difficult to enforce under the at-will system where workers can be fired at any time for almost any reason or no reason at all. As a result, many workers never come forward, allowing labor and employment law violations to persist unchecked.

Just cause protections make it more realistic for workers to speak up about workplace mistreatment because, unlike under our at-will system, the worker can be fired only if the employer can show that it was for a legitimate performance or business-related reason. By making it more feasible for workers to protest such violations, just cause protections will help improve job standards across our economy. Moreover, data shows that workers of color are more likely than white workers to be subjected to substandard conditions on the job—reporting greater

pressure to work while sick or injured for example. *See* Ugo Okere, *et al.*, NELP & Raise the Floor All., *Secure Jobs, Safe Workplaces and Stable Communities: Ending At-Will Employment in Illinois*, 16 (2021), https://www.nelp.org/publication/secure-jobs-safe-workplaces-stable-communities-ending-will-employment-illinois/.

IV.     **NEW YORK CITY'S JUST CAUSE LAWS ARE LIKELY TO SPUR MORE EFFICIENT HIRING AND MANAGEMENT PRACTICES AND NOT ADVERSELY AFFECT LABOR MARKETS OR ECONOMIC INNOVATION.**

Opponents of just cause legislation sometimes contend that it will lead employers to hire fewer employees or otherwise reduce firm productivity and innovation. Little evidence exists that that is likely. In fact, research suggests that just cause protections are likely to spur businesses to hire more efficiently and to invest in training their workers, which can boost productivity and benefit the overall economy.

For example, research on states that have adopted limitations on wrongful discharge finds that such policies spur businesses to invest more in training the workers they hire, suggesting that just cause laws may help generate a more skilled workforce. *See* Eric Hoyt, Constraining Labor's 'Double Freedom': Revisiting the Impact of Wrongful Discharge Laws on Labor Markets, 1979-2014, (Oct. 2018) (unpublished Ph.D. dissertation, University of Massachusetts), https://scholarworks.umass.edu/cgi/viewcontent.cgi?article=2396&context=dissertations_2. Similarly, economic evidence indicates that stronger job protections incentivize employers to be more careful in the hiring process, which can increase overall productivity and reduce the need for future terminations and costly turnover. *See* Ioana Marinescu, *Job Security Legislation and Job Duration: Evidence from the United Kingdom*, 27 J. Lab. Econ., 465 (2009).

Analysis of the impact on the banking industry of limitations on wrongful discharge that courts in several states have adopted has shown that the costs to businesses of such protections

have been modest and short-term. The authors of one study note that "these costs . . . should not be overestimated" and were "transitory," appearing only for the first year after the adoption of the increased employment protections and not resulting in long-term firm effects. *See* Robert C. Bird & John D. Knopf, *Do Wrongful-Discharge Laws Impair Firm Performance?*, 52 J. L. & Econ. 197, 211-12, 218-19 (2009). Some of these costs may be attributed to improved management practices spurred by heightened dismissal restrictions, such as the adoption of improved recordkeeping and employee evaluation protocols.

Nor is there evidence that just cause rights are a barrier to corporate innovation, leadership, or flexibility. A strong indication of this is the fact that major publicly traded companies generally afford their top executives just cause protections in their contracts – guaranteeing executives "golden parachutes" in cases of discharge without cause. If at-will employment were crucial for ensuring accountability and productivity, we would expect to see shareholders and corporate boards fighting such contracts, but such opposition is rarely seen. *See* Kate Andrias & Alexander Hertel-Fernandez, Roosevelt Institute, *Ending At-Will Employment: A Guide for Just Cause Reform*, 47 (2021), https://rooseveltinstitute.org/wp-content/uploads /2021/ 01/RI_AtWill_Report_202101.pdf.

Finally, it is worth noting that just cause laws do not prevent employers from disciplining or discharging workers who do not meet performance standards or from laying off workers when business declines. They simply require that employers document the needs for such actions and provide workers with advance notice and a fair process.

**V.    THE NEW YORK CITY COUNCIL'S DECISION TO DELEGATE SOME ADJUDICATORY RESPONSIBILITY TO ARBITRATORS WITH EXPERTISE IN JUST CAUSE WAS APPROPRIATE, AND IT DOES NOT VIOLATE THE FEDERAL ARBITRATION ACT, THE NEW YORK STATE CONSTITUTION'S RIGHT TO JURY TRIAL, OR THE JURISDICTION OF THE STATE COURTS.**

Plaintiffs argue that the City Council's decision under the Just Cause Laws to delegate some adjudicatory responsibility to arbitrators with expertise in just cause – by allowing complainants to elect to pursue their claims through arbitration as an alternative to filing an administrative claim with the city's Department of Consumer and Worker Protection, or to filing a lawsuit in state court – violates the Federal Arbitration Act and the state constitution's provisions guaranteeing a right to jury trial in certain cases and defining the jurisdiction of the state courts. Careful analysis shows that these contentions do not hold up.

**A.    The Federal Arbitration Act Regulates Agreements Between Parties to Arbitrate – and Has No Applicability in The Absence of Such Agreements.**

The operative provision of the Federal Arbitration Act – titled "Validity, irrevocability, and enforcement of agreements to arbitrate" – regulates enforcement of contractual agreements between parties to settle by arbitration controversies that arise between them. *See* 9 U.S.C. § 2 ("A written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."). No provision of the statute, nor any case law applying it, establishes rights or limitations that apply in the absence of a contractual arbitration agreement between (in this case) an employer and an employee. The FAA thus has no applicability to state or local laws such as the Just Cause Laws that, in the absence of a private arbitration agreement, give complainants the option of enforcing those protections through arbitration.

The cases that plaintiffs cite (out of context) for the principle that "arbitration is a matter of consent" all concern disputes interpreting either a written arbitration agreement between private parties (*Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407 (2019)), or a collective bargaining agreement between a union and an employer (*Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010); *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 414 U.S. 643 (1986); and *Gateway Coal Co. v. United Mine Workers of Am.*, 414 U.S. 368 (1974)). They thus have no bearing on whether states or cities may authorize a complainant to choose arbitration as an enforcement option when enacting new laws, like the Just Cause Laws.

Instead, it is not uncommon for state laws to provide for arbitration as an option for enforcement – in the same way that many state and local laws provide an option for agency administrative enforcement as an alternative to court litigation. *See, e.g.*, Mass. Gen. Laws ch. 90, §§ 7N¼(3)(A)(iii) & 7N½(6) (new and used car Lemon Laws providing option for arbitration at complainant's request). In fact, some state laws mandate arbitration of all disputes in certain areas. *See, e.g.*, Colo. Rev. Stat. §§ 10-4-701 to 10-4-726 (repealed by 1997 Colo. Sess. Laws 1444, but upheld by *State Farm Mut. Auto. Ins. Co. v. Broadnax*, 827 P.2d 531 (Colo. 1992)). Yet we are aware of no cases suggesting that such measures violate the FAA.

Indeed, New York State's Lemon Law – a statute that plaintiffs cite for a different point – provides complainants with an arbitration enforcement option. N.Y. Gen. Bus. Law § 198-a(k). It allows consumers who believe they have been sold a defective car to pursue a complaint against the seller through either arbitration or a state court lawsuit. *Id.* The Lemon Law has been on the books in New York since the 1980s; to our knowledge, no one has ever suggested that it is preempted by the FAA or that the federal statute otherwise prevents the legislature from providing for arbitration as an enforcement option. In fact, such FAA objections were not even

raised in the lawsuit challenging New York's Lemon Law. *See Motor Vehicle Mnfrs. Ass'n v. State*, 550 N.E.2d 919 (N.Y. 1990).

**B.** **The New York Constitution's Right to Jury Trial Does Not Restrict State or Local Governments' Ability to Provide for Non-Jury Trial Enforcement When They Create New Causes of Action That Did Not Exist at Common Law.**

Plaintiffs misconstrue the New York Constitution's right to jury trial, N.Y. Const., art. I, § 2, as prohibiting non-jury trial enforcement of newly created laws that did not exist at common law whenever the remedies that such new laws authorize are analogous to remedies that would have been classified as legal remedies at common law, such as compensatory damages.[1]

Plaintiffs' interpretation is starkly at odds with the longstanding practice in New York and most states of allowing the legislature and municipalities to enact new laws and new causes of action that did not exist at common law and to provide for non-jury trial enforcement of them – whether through administrative agency enforcement or arbitration – without regard for what type of remedies might be authorized. For example, New York City's Human Rights Law provides complainants the option of pursuing enforcement in state court, N.Y.C. Admin. Code § 8-502, or through an administrative complaint before the Commission, N.Y.C. Admin. Code § 8-109; and in such administrative proceedings, a wide range of remedies are available, including compensatory damages. *See* N.Y.C. Admin. Code § 8-120(a)(8) ("Payment of compensatory damages to the person aggrieved by such practice or act").

---

[1] While plaintiffs invoke the right to a jury trial in order to attack the Just Cause Laws, it is worth noting that fast food employers have themselves denied their employees the right to a jury trial. For instance, Chipotle Mexican Grill has required its employees to sign agreements channeling all disputes into arbitration and it has used those agreements to block access to the courts for its employees. *See, e.g.*, *Garcia v. Chipotle Mexican Grill*, No. 16 Civ. 601, 2019 WL 358503 (S.D.N.Y. Jan. 29, 2019). Moreover, the enforceability of such agreements is not impacted by the Just Cause Laws.

New York State's Human Rights Law does the same: it allows a complainant the option of either suing in court or filing an administrative complaint with the New York State Division of Human Rights. N.Y. Exec. Law §§ 297(1), (9). The law was amended in 2019 to authorize punitive damages in addition to compensatory damages (which had already been available) – and expressly provides that both may be awarded by the agency as relief in administrative actions. N.Y. Exec. Law § 297(4)(c).

While a right to jury trial is available when plaintiffs sue in state court under the New York City or New York State Human Rights Laws, no such right to jury trial obtains when complainants pursue claims administratively before the City or State human rights agency. Decisions by the agencies, including those that award damages, are reviewable in court under CPLR Article 78 – where a right to jury trial is not generally available and where the agency's factual findings that are supported by the record are accorded deference by the reviewing court. *Flacke v. Onondaga Landfill Sys., Inc.*, 507 N.E.2d 282, 69 N.Y.2d 355, 363 (N.Y. 1987). We found no case suggesting that the city or state human rights laws abridge the state constitutional right to jury trial; and damage awards by the Division of Human Rights are routinely upheld by the courts. *See, e.g.*, *Bryer v. New York City Comm'n on Human Rights*, 672 N.Y.S.2d 714, 715 (1st Dep't 1998) (upholding $100,000 compensatory damages award); *Framboise Pastry Inc. v. New York City Comm'n on Human Rights*, 30 N.Y.S.3d 49, 50 (1st Dep't 2016) (upholding $10,000 compensatory damages award).

Plaintiffs reach their erroneous interpretation by misreading *Motor Vehicle Mfrs. Ass'n*, 550 N.E.2d 919. Plaintiffs read *Motor Vehicle Mfrs.* as holding that whether the right to jury trial attaches to a cause of action – even a newly created statutory cause of action that did not exist at common law when New York's constitution was adopted or later amended – hinges solely on

whether the relief authorized under the claim includes traditionally legal remedies, such as compensatory damages. Such a standard would make little sense; and were it the law, then statutes like New York City's Human Rights Law that authorize administrative agencies to award such damages would be unconstitutional.

In *Motor Vehicle Mfrs.*, the Court of Appeals explained, "Prior to 1777 [when New York's first constitution was adopted], a jury trial was required if the <u>nature and substance of the relief requested</u> was legal; if the relief demanded was equitable, there was no right to a jury trial." 550 N.E.2d at 921 (emphasis added). From the Court of Appeals' subsequent application of this standard, as well as from the cases cited in *Motor Vehicle Mfrs.* for the proposition, it is clear that the "nature and substance of the relief requested" encompasses not simply the remedy authorized but also the claim for relief itself. Both the cause of action asserted and the remedy sought must have been triable to a jury at common law at the time that the state constitution was adopted – or be analogous to claims that were triable to a jury at that time.

The Court of Appeals applied this approach to the New York Lemon Law. The statute, which established a new system and standards enabling consumers to seek relief for violations of automobile warranties, was not enacted until the 1980s. *Id.* at 920. The court analogized the lemon law warranty enforcement provisions to a contract claim at common law, and then analyzed whether the specific remedies authorized under the lemon law were analogous to legal or equitable common law contract remedies; it concluded that they were equitable. *Id.* at 921-22. The court therefore compared both the claim for relief and the remedy sought to common law analogues in assessing whether a right to jury trial obtained.

This approach is even more evident in *Matter of Luria*, 313 N.Y.S.2d 12, 63 Misc.2d 675 (N.Y. Surr. Ct. 1970) – one of the cases cited by the Court of Appeals in *Motor Vehicles Mfrs*.

There, the court enumerated the types of claims in which jury trials were used in 1777 and then up until 1894 (the point up until which statutorily conferred jury trial rights were guaranteed by the state constitution):

> 1. The classes of cases in which juries were "heretofore used" in the Colony prior to 1777 are obscure and uncertain. It is generally agreed however that the ordinary cases in which such right was available are those specified in CPLR 4101 (subd. 1) and (2) (with the exception of those under art. 15 of the Real Property Actions and Proceedings Law). These include actions in which a party demands *and sets forth facts* which would permit a judgment for a sum of money *only* (the largest class; see 4 Weinstein-Korn-Miller, N. Y. Civ. Prac., par. 4101.11); also included are actions for ejectment; for dower; for waste; for abatement of and damages for a nuisance and to recover a chattel (replevin).
>
> Most issues of the right to trial by jury in the courts arise in actions which fall within the classes of cases enumerated above. The problem in each case is to determine whether juries were commonly used for the class of actions in the Colony of New York prior to 1777.
>
> 2. A good many statutes were enacted between 1777 and 1894 which extended the right to trial by jury. These became constitutional rights by virtue of the heretofore clauses adopted by the Conventions of 1821, 1846 and 1894. Among the more common cases were actions for divorce, annulment, partition, claims to real property, mandamus, and more important for this discussion "discovery" proceedings, i.e., claims by personal representatives to recover property belonging to the estate.

63 Misc.2d at 678 (emphasis in original). The court's enumeration makes abundantly clear that the New York Constitution's jury trial guarantee attaches only where both the claim for relief and the remedy sought were ones triable to a jury before 1894.

Applying this standard to the Just Cause Laws, there can be little doubt that no constitutional right to a jury trial obtains because neither at common law nor statutorily in early New York did any analogous cause of action exist for unjust dismissal. Instead, as Plaintiffs emphasize, at-will employment has long been the norm in the state. Thus, regardless of whether

any of the remedies authorized under the Just Cause Laws qualify as "legal,"[2] the Just Cause Laws do not confer a right to jury trial that the arbitration provision violates.

Courts in other states have reached similar conclusions, "hold[ing] that no jury trial right exists as to adjudication of a matter otherwise properly within the regulatory power of an administrative agency" – even where compensatory damages are awarded. *See, e.g.*, *McHugh v. Santa Monica Rent Control Bd.*, 777 P.2d 91, 112 (Cal. 1989) (rejecting applicability of state jury trial right to claim in municipal administrative body and gathering cases from other states holding similarly).

**C.      State or Local Governments' Providing Options for Non-Court Enforcement Does Not Trench on The Constitutional Jurisdiction of New York's State Courts.**

Nor is there any substance to plaintiffs' final contention that authorizing arbitration (and administrative) enforcement of the Just Cause Laws constitutes an unconstitutional attempt by New York City to "alter and regulate the jurisdiction and proceedings in law and equity" of the New York courts – in violation of N.Y. Const., art. VI, § 30.

As the Court of Appeals explained in *Motor Vehicle Mnfrs.* – where it rejected a similar contention that the legislature's creation of an arbitration option under New York's lemon law trenched on the jurisdiction of the state courts:

> The Supreme Court has lost no jurisdiction as a result of General Business Law § 198–a(k) [the New York lemon law] because the jurisdiction secured to it by the Constitution does

---

[2] It is also worth noting that, under the Just Cause Laws, nearly all of the remedies authorized would qualify as equitable. It is only the reference to "such other compensatory damages or injunctive relief as may be appropriate" in the final clause of the arbitration remedies section that raises a possible legal remedy:

> If the arbitrator finds that the fast food employer violated the provisions of this subchapter, it shall (i) require the fast food employer to pay the reasonable attorneys' fees and costs of the fast food employee, (ii) require the fast food employer to reinstate or restore the hours of the fast food employee, unless the employee waives reinstatement, (iii) require the fast food employer to pay the city for the costs of the arbitration proceeding, and (iv) award all other appropriate equitable relief, which may include back pay, rescission of discipline, in addition to other relief, and such other compensatory damages or injunctive relief as may be appropriate.

N.Y.C. Admin. Code § 20-1273.

not attach until a claim is made litigable, that is, made the subject of a suit or litigation in a court of law *(People ex rel. Swift v. Luce, supra).* If the consumer chooses to litigate a Lemon Law claim, the Supreme Court has full jurisdiction to adjudicate it. If the consumer chooses arbitration, the claim becomes litigable when either party seeks review of the award. Supreme Court is vested with jurisdiction to review the claim in such proceedings by applying the standards of CPLR article 75 as we have interpreted them (*see, Mount St. Mary's Hosp. v. Catherwood*, 26 N.Y.2d 493, 508, 311 N.Y.S.2d 863, 260 N.E.2d 508 [judicial review of compulsory arbitration pursuant to CPLR art. 75 must be premised on adequate evidence in the record]). In enacting the statute, the Legislature has merely created a new cause of action and, as it has done before, awarded one of the litigants the option of choosing arbitration or judicial proceedings in the first instance (*see,* Executive Law §§ 297–298 [Human Rights Law] ). Although the type of adjudication differs when a consumer elects arbitration, the statute does not withhold or abridge the court's "general original jurisdiction" (*see, Loretto v. Teleprompter Manhattan CATV Corp.*, 58 N.Y.2d 143, 152–153, 459 N.Y.S.2d 743, 446 N.E.2d 428, *supra*).

In sum, the constitutional provision is not offended by the statute because once a consumer decides to litigate a claim in court, or either party decides to seek review of the arbitration proceeding, the Supreme Court is vested with jurisdiction to hear the claim.

550 N.E.2d at 924-25.

The same reasoning applies to municipally-created causes of action like the Just Cause

Laws. It is well established that cities may authorize non-court enforcement of local laws, such

as through administrative agencies, or may choose to create private rights of action to be brought

in state court. For example, New York City's Human Rights Law provides complainants the

option of either: (1) filing an administrative complaint with the Commission – which, if the

Commission finds probable cause, can result in an administrative enforcement action, decisions

from which can then be reviewed in state court under CPLR Article 78; or (2) alternatively,

suing in state court under a private right of action. *See* N.Y.C. Admin. Code §§8-109; 116; 502.

This system has been upheld by the courts, and no court has held that allowing complainants to

pursue administrative enforcement impermissibly restricts the jurisdiction of the state courts – or

conversely, that the city creating a private right of action unconstitutionally expands state court

jurisdiction. *See Bracker v. Cohen*, 612 N.Y.S.2d 113, 115-16 (1st Dep't 1994) (upholding

NYC's authority to create private right of action enforceable in state court). Under all such enforcement avenues, court review is available at some point under state law – and a city's decision to authorize one form of enforcement or another does not amount to an attempt to regulate the jurisdiction of the state courts.[3]

The other cases plaintiffs cite – *In re Stoffer v. Department of Public Safety*, 907 N.Y.S.2d 38, 77 A.D.3d 305 (2d Dep't 2010) and *Greens at Half Hallow, LLC v. Town of Huntington*, 831 N.Y.S.2d 649 (N.Y. Sup. Ct. 2006) – are similarly inapposite. Both involved attempts by towns to assign adjudication of housing and building code violations to a municipal administrative office. As the *Stoffer* court explained, however, the legislature had expressly provided in the N.Y. Town Law that building and zoning ordinance violations should be treated for jurisdictional purposes as misdemeanors for which the legislature has vested state district courts and criminal courts with jurisdiction. *Stoffer*, 77 A.D.3d at 314-315 (quoting N.Y. Town Law § 135(1)). Here there is no analogous indication of a similar intent by the legislature.

## CONCLUSION

For the foregoing reasons, and the reasons outlined in the briefs of the City and of other *amici*, *amici* National Employment Law Project, *et al.,* respectfully suggest that Plaintiffs' Motion for Summary Judgment should be DENIED and the Defendants' Cross-Motion for Summary Judgment should be GRANTED.

---

[3] New York State courts may decide that the standard of review of arbitrators' decisions under the Just Cause Laws should differ from that of arbitrators' decisions that are issued pursuant to contractual agreements binding the parties to compulsory arbitration. This issue is not yet ripe, however, and speculation about the level of deference state courts will extend to arbitrators' decisions under the Just Cause Laws is not a proper basis for striking down the laws.

Respectfully submitted,

_____

Wayne N. Outten*
Outten & Golden LLP
685 Third Ave., 25th Floor
New York, NY 10017
wno@outtengolden.com
(212) 245-1000 ext. 9810

*_Counsel of Record_

Paul K. Sonn
National Employment Law Project
90 Broad St., Suite 1100
New York, NY 10004
psonn@nelp.org
(646) 693-8215

_Attorneys for Amici Curiae National Employment Law
Project, et al._