## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**RESTAURANT LAW CENTER and NEW YORK STATE RESTAURANT ASSOCIATION**,

        *Plaintiffs*,

v.

**CITY OF NEW YORK and SANDRA ABELES, in her official capacity as Commissioner of the NEW YORK CITY DEPARTMENT OF CONSUMER AND WORKER PROTECTION**,

        *Defendants*.

**Case No.: 1:21-CV-04801 (DLC)**

*Electronically Filed*

*Oral Argument Requested*

## PLAINTIFFS' RESPONSE TO DEFENDANTS' LOCAL CIVIL RULE 56.1 STATEMENT OF MATERIAL UNDISPUTED FACTS

Pursuant to Local Rule 56.1, Plaintiffs' provide the following responses to Defendants' Local Civil Rule 56.1 Statement of Material Undisputed Facts ("Defendants' 56.1")[1]:

## I.   The City's Regulation of the Fast Food Workplace in New York City

### A.   The Enactment of Fast Food Fair Work Practices

1.     In 2017, the City of New York ("City") adopted Local Law Nos. 100, 106 and 107 of 2017, which added a new chapter 12 (entitled "Fair Work Practices") to the New York City Administrative Code ("N.Y.C. Admin. Code"). *See* "Declaration of Carlos Fernando Ugalde Alvarez" dated August 10, 2021 ("Ugalde Decl."), Exs. A-C.

**Response:**     Plaintiffs admit that in 2017, the New York City Council adopted Local Law Nos. 100, 106, and 107 of 2017 which included adding a new chapter 12 to the New York City Administrative Code.

2.     Local Law No. 100 of 2017 "amend[ed] the [N.Y.C. Admin. Code], in relation to banning consecutive work shifts in fast food restaurants involving both the closing and opening of the restaurant." Ugalde Decl., Ex. A.

**Response:**     Plaintiffs admit that the text of Local Law 100 of 2017 states it is "[t]o amend the administrative code of the city of New York, in relation to banning consecutive work shifts in fast food restaurants involving both the closing and opening of the restaurant."

3.     Local Law No. 106 of 2017 "amend[ed] the [N.Y.C. Admin. Code], in relation to requiring fast food employers to offer work shifts to current employees before hiring additional employees." Ugalde Decl., Ex. B.

---

[1] Citations herein are ascribed the same meaning as in Plaintiffs' Local Rule 56.1 Statement of Undisputed Material Facts ("SOUF"). Dkt. 22.

**Response:**   Plaintiffs admit that the text of Local Law 106 of 2017 states it is "[t]o amend the administrative code of the city of New York, in relation to requiring fast food employers to offer work shifts to current employees before hiring additional employees."

4.   Local Law No. 107 of 2017 ("Local Law 107") "amend[ed] the [N.Y.C. Admin. Code], in relation to establishing general provisions governing fair work practices and requiring certain fast food employers to provide advance notice of work schedules to employees and to provide a schedule change premium when hours are changed after required notices."  Ugalde Decl., Ex. C.

**Response:**   Plaintiffs admit that the text of Local Law 107 states it is "[t]o amend the administrative code of the city of New York, in relation to establishing general provisions governing fair work practices and requiring certain fast food employers to provide advance notice of work schedules to employees and to provide a schedule change premium when hours are changed after required notices."

B.   **The City's Adoption of the State's Definition of "Fast Food Establishment"**

5.   Subchapter 1 of chapter 12 of title 20 of the N.Y.C. Admin. Code sets forth general provisions applicable to the rest of chapter, including a "definitions" section that is codified at N.Y.C. Admin. Code § 20-1201.  *See* Ugalde Decl., Ex. C, § 1.

**Response:**   Plaintiffs admit that subchapter 1 of chapter 12 of title 20 of the administrative code of the city of New York contains a "Definitions" section codified at N.Y.C. Admin. Code § 20-1201.

6.   N.Y.C. Admin. Code § 20-1201 defines, in part, the term "fast food establishment."  Ugalde Decl., Ex. D at N.Y.C. Admin. Code § 20-1201.  N.Y.C. Admin. Code § 20-1201.

**Response:**   Plaintiffs admit that N.Y.C. Admin. Code § 20-1201 contains a definition for the term "fast food establishment."

7.      During a March 3, 2017 hearing held by the Committee on Civil Service and Labor ("Committee") of the Council of the City of New York ("City Council") on the legislation that, as amended, became Local Law 107, City Council Member Brad S. Lander, who was the lead sponsor of the legislation that became Local Law 107, stated that the definition of "fast food establishment" was adopted from the New York State Department of Labor's "Hospitality Industry Wage Order," which is codified at part 146 of title 12 of the New York Codes, Rules, and Regulations ("NYCRR").  *See* Ugalde Decl., Ex. E at 135:4 – 135:16.

**Response:**   Denied.  Plaintiffs deny that at the March 3, 2017 hearing, City Council Member Brad S. Lander stated that the definition of "fast food establishment" was adopted from the New York State Department of Labor's Hospitality Industry Wage Order.  To the contrary, he referred to "fast food chain businesses" in the portion of the March 3, 2017 cited by Defendants.  Notably, N.Y.C. Admin. Code § 20-1201 contains a definition for the term "chain," which is just one possibility for what Member Lander was referring to when he stated "fast food chain businesses."  Moreover, the portion of the transcript cited by Defendants does not mention any of the New York State Department of Labor's wage orders.

8.      Specifically, during the Committee's March 3, 2017 hearing, City Council Member Brad S. Lander stated, in part, as follows: "There are six bills in this package . . . two of them are not fast food bills and I think there are some issues to talk about the small businesses there, but all of the advance notice of scheduling, the two-week advance notice, clopenings; access to hours . . . those are exclusively for fast food chain businesses as defined in the State, you know by the same definition that was used by the Labor Board in their fast food work."  *Id.*

**Response:**    Plaintiffs admit only that the cited document contains the quoted language.  Plaintiffs further note that not once does Member Lander refer to the New York State Department of Labor's Hospitality Industry Wage Order.

      i.      The New York State's Definition of "Fast Food Establishment"

      9.      By determination dated May 7, 2015, the then Acting Commissioner of Labor of the State of New York ("Labor Commissioner") (a) appointed a wage board "to inquire into and report and recommend adequate minimum wages and regulations for fast food workers" (the "Fast Food Wage Board"), and (b) stated, in part, as follows:

> Pursuant to Section 653 of the Labor Law, I am of the opinion that a substantial number of fast food workers in the hospitality industry are receiving wages insufficient to provide adequate maintenance and to protect their health. . . . My opinion is based on data and studies in my possession that show that 60% of such fast food workers in New York are in families enrolled in at least one public assistance program.  Nationally, fast food workers are twice as likely as all other workers to be in families that receive public assistance.  In New York, 75% of fast food workers earn wages at the lowest level reported ($9.25 per hour or less) in Occupational Employment Statistics surveys.  Nationally, nearly half (46%) of fast food jobs provide between 20 and 35 hours per week, and 87% of fast food workers do not receive health benefits.

Ugalde Decl., Ex. F.

**Response:**    Plaintiffs admit that the Determination Regarding the Adequacy of Wages contains the language quoted by Defendants, but note that the omitted sentence states "When I refer to fast food workers, I mean those workers who prepare food and serve customers in limited service restaurants, where customers order at the counter and pay in advance."

      10.      In or about July 27, 2015, the Fast Food Wage Board issued a "Report of the Fast Food Wage Board to the NYS Commissioner of Labor" (the "Fast Food Wage Board Report").  *See* Ugalde Decl., Ex. G.

**Response:**     Plaintiffs admit only that on or about July 27, 2015, the Fast Food Wage Board appointed by then Acting Labor Commissioner Mario J. Musolino issued and finalized a report to the New York State Commissioner of Labor.

11.     In the Fast Food Wage Board Report, the Fast Food Wage Board set forth findings and recommendations based on written and oral testimony received from individuals and organizations, statistical information from the New York State Department of Labor's Division of Research and Statistics, and its independent knowledge of the industry and economy.  *See id*. at 1-7.

**Response:**     Plaintiffs admit only that the Fast Food Wage Board report states that its findings and recommendations were based on written and oral testimony from "fast food workers; employers; academics; policy experts; community, labor, and religious organizations; elected officials; and concerned citizens, as well as statistical information from the New York State Department of Labor's Division of Research and Statistics."  Plaintiffs dispute that the contents of this Fast Food Wage Board report are properly before this Court as Plaintiffs only challenge the Just Cause Laws.

12.     The Fast Food Wage Board found, in part, as follows:

a.     "Franchising is the dominant business model in the fast food industry."

b.     "The [fast food] industry enjoys large profits and growth. . . ."

c.     "This successful service industry also stands out as heavily subsidized by taxpayers through public assistance paid to its workforce."

d.     "The combination of profits and impoverishment are the product of the industry's preferences for paying minimum wages and offering part-time hours on irregular schedules.  Workers are left with weekly wages and schedules that are difficult to live on or work around . . . ."

e.     "Fast food workers are twice as likely to be members of families with earnings below or near poverty than the workforce as a whole.  These workers are among the lowest paid in the United States.  According to a study conducted in 2013 by

the University of California Berkeley and the University of Illinois, Urbana-Champaign, fast food workers and their families are more than twice as likely as working families in general to be enrolled in public assistance programs. Nationally, 52% of fast food worker families participate in at least one public benefit compared to 25% of all working families. . . .  The story is much of the same in New York State, where 60% of fast food workers are on public assistance. . . . [T]he total cost of public assistance provided to fast food workers in New York is $903 million per year."

f.      "Workers reported the impact of low pay on their health and emotional well-being and reported myriad hardships, including overcrowded living spaces, inadequate and unhealthy food, homelessness, lack of health insurance, heavy debt, inability to cover bills for necessities like medication, heat and lights, lack of sleep, physical and emotional exhaustion, inability to afford clothing for their children or themselves, dependence on public assistance, lack of reliable transportation, inability to afford college, having to drop out of high school, and living in crime-ridden neighborhoods."

g.      "Academic experts confirmed the impact of poverty on worker health . . . ."

h.      "In addition to low hourly wages, fast food work can be characterized primarily by its minimal work hours and unpredictable schedules."

i.      "The impact of low hours and unpredictable scheduling is profound: paychecks are exceptionally small and inconsistent, and workers cannot take another much-needed job or otherwise plan their personal lives, sometimes missing significant life events."

*Id*. at 7-12.

**Response:**    Plaintiffs admit that the cited document includes the quoted language.  Plaintiffs object that this fact would not be admissible because the Fast Food Wage Board report from 2015, which cites to data from as early as 2007, is not relevant to this case (which only challenges the Just Cause Laws, not any wage law), Fed. R. Evid. 401(b), and therefore should not be considered by this Court, Fed. R. Civ. P. 56(c)(2).

13.    Among other things, the Fast Food Wage Board "recommend[ed] that the scope of covered employees and establishments be determined according to the following definitions":

"Fast food employee" shall mean any person employed or permitted to work at or for a Fast Food Establishment by any employer where such person's job duties include at least one of the following: customer service, cooking, food or drink preparation, delivery, security, stocking supplies or equipment, cleaning or routine maintenance.

"Fast food establishment" shall mean any establishment in the state of New York: (a) which has as its primary purpose serving food or drink items; (b) where patrons order or select items and pay before eating and such items may be consumed on the premises, taken out, or delivered to the customer's location; (c) which offers limited service; (d) which is part of a chain; and (e) which is one of thirty (30) or more establishments nationally, including: (i) an integrated enterprise which owns or operates thirty (30) or more such establishments in the aggregate nationally; or (ii) an establishment operated pursuant to a Franchise where the Franchisor and the Franchisee(s) of such Franchisor own or operate thirty (30) or more such establishments in the aggregate nationally.   "Fast Food Establishment" shall include such establishments located within non-Fast Food Establishments.

"Chain" shall mean a set of establishments which share a common brand, or which are characterized by standardized options for décor, marketing, packaging, products, and services.

"Franchisee" shall mean a person or entity to whom a franchise is granted.

"Franchisor" shall mean a person or entity who grants a franchise to another person or entity.

"Franchise" shall have the same definition as set forth in General Business Law Section 681.

"Integrated enterprise" shall mean two or more entities sufficiently integrated so as to be considered a single employer as determined by application of the following factors: (i) degree of interrelation between the operations of multiple entities; (ii) degree to which the entities share common management; (iii) centralized control of labor relations; and (iv) degree of common ownership or financial control.

*Id*. at 20-21.

> **Response:**      Plaintiffs admit that the cited webpage, published in 2015, contains the quoted language.  Plaintiffs object that this fact would not be admissible because the Fast Food Wage Board report from 2015, which cites to data from as early as 2007, is not relevant to this case (which only challenges the Just Cause Laws, not any wage law), Fed. R. Evid. 401(b), and therefore should not be considered by this Court, Fed. R. Civ. P. 56(c)(2).

14.     With respect to the recommended definition of the term "Fast Food Establishment," the Fast Food Wage Board stated, in part, as follows:

> . . . [T]o address concerns that new and future chains will have an opportunity to develop the operational and financial resources to absorb the [minimum wage] increase, we recommend that $15 wage rate be applicable only to fast food chains with 30 or more locations nationally, since chains of this size are better equipped to absorb a wage increase due to greater operational and financial resources, and brand recognition. . . .

*Id.* at 19.

**Response:**     Plaintiffs admit that the cited document contains the quoted language, in part.  Plaintiffs object that this fact would not be admissible because the Fast Food Wage Board report from 2015, which cites to data from as early as 2007, is not relevant to this case (which only challenges the Just Cause Laws, not any wage law), Fed. R. Evid. 401(b), and therefore should not be considered by this Court, Fed. R. Civ. P. 56(c)(2).

15.     On September 10, 2015, the Labor Commissioner issued a minimum wage order adopting the recommendations of the Fast Food Wage Board to increase the wage for certain fast food workers in the State of New York ("Minimum Wage Order").  *See* Ugalde Decl., Ex. H.

**Response:**     Plaintiffs admit that on September 10, 2015, the Commissioner of Labor adopted the recommendations of the 2015 Fast Food Wage Board to increase the minimum wage for certain fast food workers in the state of New York to $15.00 an hour by 2018 for New York City and by 2021 for the rest of the state.

16.     In issuing the Minimum Wage Order, which is codified in the NYCRR, the Labor Commissioner adopted the definition of the term "Fast Food Establishment" recommended by the Fast Food Wage Board.  *See* Ugalde Decl., Ex. I, § 146-3.13.

**Response:**   Plaintiffs admit that the Hospitality Industry Minimum Wage Order is codified in the NYCRR and a definition for the term "fast food establishment" is included at 12 NYCRR 146-3.13(b).

17.   The New York State Department of Labor's "Minimum Wage for Fast Food Workers Frequently Asked Questions" webpage provides the following guidance on the meaning of the term "Fast Food Establishment," as utilized in the Minimum Wage Order:

> "Does a Fast Food Establishment include chains where all the locations are within New York State? Yes, local chains that only have locations within New York State are covered as long as they have at least 30 locations.  There is no requirement that the chain have locations outside of New York State."

> "Does a Fast Food Establishment include chains with less than 30 locations in New York State? Yes, as long as the chain has at least 30 locations nationally."

Ugalde Decl., Ex. J at 3.

**Response:**   Plaintiffs admit that the cited document contains the quoted language.

18.   In or about October 2015, the National Restaurant Association, which is affiliated with Plaintiff Restaurant Law Center (*see* Compl. ¶ 12; ECF Dkt. No. 23, ¶ 85), appealed the Minimum Wage Order to the New York State Industrial Board of Appeals on several grounds, including on the ground that the Minimum Wage Order "runs afoul of the Dormant Commerce Clause . . . [because it] improperly discriminates against interstate commerce by burdening only *national* chains whose franchisees share characteristics with others outside New York." *See* Ugalde Decl., Ex. K at 19.

**Response:**   Denied.  Plaintiffs admit only that the Restaurant Law Center is an independent public policy organization affiliated with the National Restaurant Association (Battaglia Decl. Ex. 3) and that the quoted language appears in a single part of the argument raised by the National Restaurant Association that the Minimum Wage Order runs afoul of the Dormant

Commerce Clause.  Plaintiffs object to the inclusion of this Paragraph in Defendants' Rule 56.1 Statement as the argument made by a nonparty challenging a wage order that is unrelated to this litigation is (1) wholly irrelevant to the arguments before this Court, *see* Fed. R. Evid. 401(b), and (2) fails to establish the absence or presence of a genuine dispute of material fact.  Fed. R. Civ. P. 56(c)(1)(B).

19.    On December 9, 2015, the New York State Industrial Board of Appeals confirmed the Minimum Wage Order and denied the National Restaurant Association's petition for review.  *See* Ugalde Decl., Ex. H.

**Response:**    Plaintiffs do not dispute that on December 9, 2015, the Industrial Board of Appeals confirmed the report and recommendation for the 2015 fast food wage board, dated September 10, 2015 and the National Restaurant Association's petition for review was denied.  Plaintiffs object to the inclusion of this Paragraph in Defendants' Rule 56.1 Statement as the actions of a nonparty challenging a wage order which is unrelated to this litigation is (1) wholly irrelevant to the arguments before this Court, *see* Fed. R. Evid. 401(b), and (2) fails to establish the absence or presence of a genuine dispute of material fact, Fed. R. Civ. P. 56(c)(1)(B).

20.    Subsequently, the National Restaurant Association challenged the December 9, 2015 determination of the New York State Industrial Board of Appeals in New York State court.  *See* Ugalde Decl., Ex. L.

**Response:**    Plaintiffs do not dispute that an appeal from the determination of the Industrial Board of Appeals was taken by the State of New York Supreme Court, Appellate Division Third Judicial Department.  Plaintiffs object to the inclusion of this Paragraph in Defendants' Rule 56.1 Statement as the actions by a nonparty to this litigation in challenging a

wage order that is unrelated to this litigation is wholly irrelevant to the arguments before this Court. *See* Fed. R. Evid. 401(b).

21. By "Opinion and Order" dated June 9, 2016, in the *Matter of Nat'l Res. Ass'*
*v. Comm'r of Labor*, the Supreme Court of the State of New York, Appellate Division, Third Judicial Department, affirmed the December 9, 2015 determination of the New York State Industrial Board of Appeals and, *inter alia*, dismissed the National Restaurant Association's Dormant Commerce Clause claim.  *See* id.

 **Response:** Plaintiffs admit that the determination of the Industrial Board of Appeals was affirmed by the State of New York Supreme Court, Appellate Division Third Judicial Department.  Plaintiffs object to the inclusion of this Paragraph in Defendants' Rule 56.1 Statement as the actions by a nonparty to this litigation in challenging a wage order that is unrelated to this litigation is wholly irrelevant to the arguments before this Court.  *See* Fed. R. Evid. 401(b).

## II. The City's Enactment of Local Law Nos. 1 and 2 of 2021

22. On February 13, 2019, at its stated meeting, the City Council introduced two pieces of legislation—*i.e.*, Introduction ("Intro.") Nos. 1396-2019 and 1415-2019—that, as amended, respectively became Local Law No. 1 of 2021 ("Local Law 1") and Local Law No. 2 of 2021 ("Local Law 2").  *See* Ugalde Decl., Ex. M at 415-17, 456-59.

 **Response:** Plaintiffs deny Paragraph 22 to the extent it purports that Int. No. 1396 and Int. No. 1415 became Local Law No. 1 and Local Law No. 2 of 2021 because Int. No. 1396-A and Int. No. 1415-A, respectively became Local Law No. 1 and Local Law No. 2 of 2021.

23. Intro. No. 1396-2019 was sponsored by 32 City Council Members.  *See* Ugalde Decl., Ex. N.

 **Response:** Plaintiffs admit that 32 City Council Members were listed as sponsors to Int. No. 1396.

24.     Intro. No. 1396-2019 was sponsored by 30 City Council Members.  *See* Ugalde Decl., Ex. O.

**Response:**     Denied.  Plaintiffs admit that 30 City Council Members were listed as sponsors to Int. No. *1415.*

25.     On February 13, 2020, the Committee held a hearing on Intro. Nos. 1396-2019 and 1415-2019 (the "February 13, 2020 Committee Hearing").  *See* Ugalde Decl., Ex. P.

**Response:**     Plaintiffs admit that a hearing was held by the Committee on February 13, 2020 that included discussion of Int. Nos. 1396 and 1415.

26.     At the February 13, 2020 Committee Hearing, several individuals testified on Intro. Nos. 1396-2019 and 1415-2019.  *See generally id*.

**Response:**     Plaintiffs admit that individuals testified regarding Int. Nos. 1396 and 1415.

27.     During the February 13, 2020 Committee Hearing, Lorelei Salas, in her capacity as Commissioner for Consumer and Worker Protection and head of the New York City Department of Consumer and Worker Protection ("DCWP"), testified about the fast food industry and stated, in part, as follows:

> Workers in the fast food industry have historically been confronted with declining real wages and unstable working schedules.  However, these workers, more than 67,000 in New York City alone have continually fought to address these challenges.  Most recently, this Administration fought alongside them for a $15 minimum age, to end abusive scheduling practices and to promote full-time employment in the industry.
>
> During the Council's deliberation on the Fair Workweek legislation, the Administration testified to and cited extensive research that highlighted the negative impacts of unpredictable and unstable schedules in the fast food industry.  As you may know, unpredictable schedules have negative impacts for both workers and businesses.  For workers, the instability makes it hard to work as [sic] second job, to manage a household budget, to go to school or arrange for childcare and elder care.

> For businesses, unpredictable schedules are associated with understaffing at peak business hours and weak execution of business practices processes, resulting in poor customer service, reduced sales and lower productivity.

*Id*. at 15:20 – 16:19.

> **Response:**    Plaintiffs admit only that the cited document contains the quoted language, in part.

28.    During the February 13, 2020 Committee Hearing, Lorelei Salas also testified the following about the benefits of Intro. Nos. 1396-2019 and 1415-2019:

> We do point out in our testimony that this policy does not just provide for better working conditions but also improve [sic] businesses productivity and employees are happier at work and it provides for a better service to customers. . . .

*Id*. at 36:8 – 36:12.

> **Response:**    Plaintiffs admit only that the cited document contains the quoted language, in part.

29.    During the February 13, 2020 Committee Hearing, Kathleen Reilly, in her capacity as New York City Government Affairs Coordinator for Plaintiff New York State Restaurant Association, testified, in part, as follows: "All of that being said, we understand the intentions of the legislation.  We understand the intention of protecting workers and making sure they have access to information and resources to right any workplace illegal acts that are taking place." *Id*. at 72:18 – 72:22.

> **Response:**    Plaintiffs admit only that the cited document contains the quoted language, but note that this quote is taken out of context and omits key testimony regarding the dangers and legal deficiency of the legislation, including because of the vague language in the Just Cause Laws.  The testimony also included the following:

> The mechanism, the employer has the burden of proof of proving that they had just cause. If a complaint is lodged, the employers is guilty until proven innocent, that is contrary to American justice. Vague language posses [sic] an issues especially

13

> with the term egregious, which I know was used as an example earlier today but if you're the business owner and you know you have the burden of proving that you followed the rules exactly, you're going to be put in a very difficult decision when you witness something that to you is egregious, your personal investment is on the line, your brand is on the line, the safety of everyone in your store is on the line but you know that your decision making is going to be verified by some third party who might disagree with the interpretation.

*See* Pl. SOUF ¶ 28 (Battaglia Decl. Ex. 12 at 73:2-17).

      30.    During the February 13, 2020 Committee Hearing, the following exchange occurred between City Council Member Brad S. Lander and Keith Stephenson, the Director of State and Local Government Affairs for the National Restaurant Association, which is affiliated with Plaintiff Restaurant Law Center:

> COUNCIL MEMBER LANDER: . . . It's not illegal for a manager to fire an employee who they don't feel smiles enough.  It's not illegal for an employer, for a manager to fire an employee without any reason or cause or notice.  Do you think that's right?

> KEITH STEPHENSON: Can I address that.

> COUNCIL MEMBER LANDER: Yeah, if you'll answer.  If you start by answering no.

> KEITH STEPHENSON: Absolutely not.

> COUNCIL MEMBER LANDER: It's not right, wait, absolutely it's not right.  Then we have a lot of common ground.  I just want to make sure I understood what you said that it's not right?

> KEITH STEPHENSON: But the devil's in the details here.  The way you've written it is —

> COUNCIL MEMBER LANDER: We need to be able to ask the question, so I'm going to just finish asking this question.  I asked a question; I think you said absolutely not.  You know, I said, is it right that an employer could fire an employee for those reasons that I gave? And you think it's, not right?

> KEITH STEPHENSON: I don't think it's good business.  I think it's an at-will state, so can it happen? Is it legal?

> COUNCIL MEMBER LANDER: Sure.

KEITH STEPHENSON: Is it right, no.

COUNCIL MEMBER LANDER: Alright, great, then we have a lot of common ground to build from because if you agree it's not right for someone to be able to be fired without cause or a good reason, then figuring out how we protect people from being fired without cause and good reason is what we're going to do here.

*Id*. at 86:2 – 87:12.

> **Response:**     Plaintiffs admit only that the cited document contains the quoted language, but note that this exchange is taken out of context and omits key testimony regarding the dangers and legal deficiency of the legislation.   *See* Pl. SOUF ¶ 28 (Battaglia Decl. Ex. 12 at 88:16 – 89:4).

31.     In connection with the February 13, 2020 Committee Hearing, the Committee received written testimony from several individuals, organization or entities.   *See* Ugalde Decl., Ex. Q.

> **Response:**     Plaintiffs admit that written testimony was submitted to the Committee in connection with the hearing on February 13, 2020.

32.     Plaintiff New York State Restaurant Association's written testimony, which was submitted by Kathleen Reilly, states, in part, as follows:

> Despite all of the many concerns we have brought forward about the impact of Intro 1415 as currently drafted, we really do understand and agree with the goal of protecting employees from wrongful termination and retaliation.  We appreciate the bravery of workers who have shared their experiences and exposed some of these illegal acts.  It seems clear to us that the workers who have been victimized here did not feel that their existing protections and recourse were enough. . . .

*Id*. at 10.

> **Response:**     Plaintiffs admit the cited document contains the quoted language and further note that the quotation continues, in relevant part, to state "[i]n some cases, perhaps workers were not aware of what would qualify as retaliation or wrongful termination," which

15

makes clear that "illegal acts" refers to actions already illegal under existing laws before the Just Cause Laws were implemented.

33.     Several Dunkin' franchisees or operators submitted virtually identical written testimony, which states, in part, as follows:

> I am a Dunkin' franchisee and I write on behalf of myself, and my organization to oppose Intros. 1396-2019 (fast food employee layoffs) and 1415-2019 (Just Cause).
>
> While well-intended, these bills will cause harm to the very core of my business – of which my employees are the foundation – and have unintended consequences.  I implore the Council to stop pursuing legislation that creates such a hostile business environment in New York for small business owners like myself.
>
> Intro 1415-2019 – Just Cause
>
> Intro 1415-2019 seeks to "prohibit fast food employers from terminating the employment of a fast food employee without just cause".  As someone who has employed New Yorkers for years, I can attest that I value my employees and invest considerable time, training, and resources into every new hire. . . .

*Id*. at 131-194.

**Response:**     Plaintiffs admit that the written testimony submitted in connection to the February 13, 2020 hearing included testimony by Dunkin' franchisees.

34.     In addition to the testimony received in connection with the legislation that became Local Laws 1 and 2, the City Council was lobbied by a number of entities and organizations, including (a) Plaintiffs New York State Restaurant Association, (b) the National Restaurant Association, which is affiliated with Plaintiff Restaurant Law Center, (c) McDonald's USA, LLC, and (d) Local 32BJ SEIU.  *See* Ugalde Decl., Ex. R.

**Response:**     Plaintiffs admit that people affiliated with these four entities are listed in New York City's "Lobbyist Search" website.  Defendants object to this statement as irrelevant and thus immaterial, as none of the first three entities are alleged to have had any impact

on or say in the strategy or drafting of the law, but only to have opposed the law (unlike the last entity, Local 32BJ SEIU).  *See* Fed. R. Evid. 401(b).

35.     On December 15, 2020, the City Council respectively amended Intro. No. 1396-2019 and Intro. No. 1415-2019 as Intro. No. 1396-A-2019 and Intro. No. 1415-A-2019-A. *See* Ugalde Decl., Exs. S-T.

**Response:**     Plaintiffs admit that Int. No. 1396 and No. 1415 were amended on December 15, 2020 as Int. No. 1396-A and Int. No. 1415-A, respectively.

36.     On December 15, 2020, the Committee held a hearing on Intro. Nos. 1396-A-2019 and 1415-A-2019 (the "December 15, 2020 Committee Hearing").  *See* Ugalde Decl., Ex. U.

**Response:**     Plaintiffs admit that on December 15, 2020, the Committee on Civil Service and Labor held a hearing on Int. No. 1415-A and Int. No. 1396-A.

37.     During the December 15, 2020 Committee Hearing, City Council Member Brad S. Lander stated, in part, as follows:

> . . . Fast-food workers have been on the front lines of this pandemic serving their neighbors, working in tight quarters, taking on new responsibilities for cleaning and sanitizing, and yet often unable to speak up about health and safety issues for fear that they could lose their jobs I...I think we should be able to agree that no one should be fired on a whim without a reason, without any notice, but for years that's been the norm in the fast food industry, fast food workers the majority of whom are women of color have fought to raise wages and demand workplace protections, and we owe it to them to hand on fair [sic] firings that cause stress and uncertainty in their lives.  I do want to speak very briefly to some of the push back we've been hearing from the industry because look, we all have deep sympathy for our neighborhood small businesses and including the restaurants that bring so much life to our neighborhoods, and are facing such a devastatingly hard time during this pandemic, but I think it's important to point out a few things.  First, this is only fast-food chains, with stores, you know, 30 or more stores.  This is not your neighborhood restaurant.  The bill doesn't to [sic] into effect for six months, which is long after pray to God indoor dining will be restored, and let's be clear, fast-food restaurants aren't making most of their money on in-door dining like that's not the Dunkin' Donuts business model.  So, drive-through, pick-up and delivery are a big

piece of what they've been doing even in the pandemic. As the Chair said, businesses can still fire employees for misconduct or for failure to perform work duties. You just have to give people feedback, and have written and clear policies like every good employer does, and layoffs for economic reasons are also still allowed. They just need to be in order of seniority so that bosses can't laid [sic] people off arbitrarily, and essentially do an unfair firing in the name of a layoff. Now, it's no surprise industry lobbyists are insisting that corporations should be able to fire people at any time with no reason, but I do think it's worth noting that the fast, the main fast food companies have actually seen their share prices rise by an average of 20% in the last year. Collectively, they were $42.4 billion more than they were a year ago. They can afford to treat their workers with basic decency. In closing, it's important to not [sic] that this bill comes from the organizing of fast food workers and their courage in stepping up to organize, and the work they did in the fight for '15 fighting for paid sick leave, for a fair work week that gives them a path to full-time jobs, and stable schedule. It is because of their courage and their organizing that these jobs, which were contingent poverty jobs a decade ago are now jobs that people want to be able to keep, and that's why it's important to make sure that they can't be fired on a whim, that they can have the job security if they show up and do their job, that they can speak out if they need to if they don't get the... There were rats in their stores or there have been in the Bronx in the last two weeks. So, big credit the workers, and SEIU 32BJ for helping them organize. I'm still on the cusp of giving these essential but long disrespected workers some job stability with this just cause legislation. . . .

*Id*. at 6:12 – 9:5.

> **Response:** Plaintiffs admit only that the cited document contains the quoted language and deny the accuracy of portions of the testimony without evidence, including that the only burden on employers under the Just Cause Laws is they "just" have the obligation to "give people feedback, and have written and clear policies" and that layoffs "just" have "to be in order of seniority so that bosses can't laid [sic] people off arbitrarily, and essentially do an unfair firing in the name of a layoff." Plaintiffs also deny the truth of Councilmember Lander's blanket and unsupported statement that "the main fast food companies have actually seen their share prices rise by an average of 20% in the last year" as speculative and lacking foundation and therefore inadmissible for its truth at summary judgment. *See Vale v. United States of Am.*, 673 F. App'x 114, 116 (2d Cir. 2016).

38.     During the December 15, 2020 Committee Hearing, City Council Member

Brad S. Lander further stated, in part, as follows:

> . . . Fast food workers have been subjected to unfair work environments, and have
> been the victims of unfair reduction of hours or arbitrary termination causing them
> to live in a constant state of uncertainty, which is completely unacceptable.  These
> employees are getting up before dawn by working over night, commuting long
> hours to work, doing physically demanding work and missing meals with their
> family.  In exchange they are often faced with impossible choices, endure hostile
> working conditions, leave or be fired and face financial struggle without a job.
> Many of these families are already living paycheck to paycheck.  Losing their jobs
> for no reason would have catastrophic effects.  This is simply unacceptable.  Just
> cause legislation is a chance for hard-working New Yorkers to finally have the
> peace of mind that comes with knowing that they will be treated with the dignity of
> respect that they deserve. . . .

*Id*. at 11:10 – 12:5.

**Response:**     Plaintiffs admit that the cited document contains the quoted

language, but that it was stated by City Councilmember Adrienne E. Adams.  Plaintiffs deny the

truth of Councilmember Adams' statement that fast-food workers in New York generally face the

conditions she describes as unsupported and without evidence.  Plaintiffs also object that this

evidence is not admissible for its truth because it is "speculative" and "lacks foundation."  *See*

*Vale v. United States of Am.*, 673 F. App'x 114, 116 (2d Cir. 2016).

39.     On December 15, 2020, the Committee passed Intro. Nos. 1396-A-2019 and

1415-A-2019 by a vote of five (5) in the affirmative and one (1) in the negative.  *See* Ugalde Decl.,

Ex. U at 14.

**Response:**     Plaintiffs admit that on December 15, 2020, Int. Nos. 1396-A and

1415-A were adopted by the Committee by a vote of 5 in the affirmative, one in the negative and

no abstentions.

40.     On December 15, 2020, the Committee issued a report on Intro. Nos. 1396-

A-2019 and 1415-A-2019, which states, in part, as follows:

. . . At-will employment recognizes that employees are allowed to resign from their places of employment at any time and without any reason and that employers should have the same right for termination. On the other hand, at-will employment can make it more difficult for workers to prove that they have been fired in an illegal way that violates the law, and doing so often requires more time and money for legal fees that many do not have.

*        *        *

New York State is an at-will employment state. . . . As part of an at-will economy, wrongful termination is a common complaint, particularly within the NYC fast-food industry. NYC has approximately 3,000 fast-food locations that employ more than 67,000 people, with about 2/3 of these fast food workers being women, 2/3 immigrants, and 88% people of color overall. Because the fast food industry in NYC is generally made up of women, immigrants, and people of color, advocates argue that the lack of legal protections against wrongful termination can exacerbate mistreatment in this industry and may result in workers, their families, and their communities struggling to maintain a financially stable life.

New findings from a report entitled "Fired on a Whim: The Precarious Existence of NYC Fast-food Workers" prepared by the Center for Popular Democracy, Fast Food Justice, the National Employment Law Project, and 32BJ SEIU suggest that job loss and reductions in hours are common within the industry and, further, a cause for significant financial hardship for its workers. As part of the report, a survey of 539 NYC fast-food workers was conducted, with survey responses indicating that:

- Fast food employers terminate workers with alarming frequency, with 50% of workers surveyed having been fired, laid off, or compelled to quit a fast food job due to intolerable working conditions, and 25% of those who reported job loss have experienced multiple job losses within the industry;

- Many workers are denied even a basic explanation when terminated, with 65% of workers reporting that in at least one instance they had not been given a reason for termination;

- Termination forces workers into poverty, with 62% of respondents who lost a fast food job or suffered a reduction in hours experiencing financial hardship as a result, including food insecurity, housing instability, loss of resources to pay for childcare, eviction, or being forced to drop out of school; and

- Drastic cuts in hours are common, with 58% of the 237 fast food worker sample [sic] reporting having experienced a significant and ongoing reduction in hours in one or more jobs, with workers losing an average of 14 hours per week. . . .

Ugalde Decl., Ex. V at 3-6.

**Response:**   Plaintiffs admit only that the cited document contains the quoted language.  Plaintiffs deny the accuracy of any of the claims in this document, especially the percentages included.  The Committee cited one document for all these findings:  a "report" by the SEIU Local 32BJ, along with SEIU-funded and affiliated National Employment Law Project and the Center for Popular Democracy, which is based on an unscientific survey of just 537 fast-food workers.  The report itself admits that the survey limitations included "recruitment bias and self-selection         bias         (individuals         chose         whether         or         not         to         respond)." https://populardemocracy.org/sites/default/files/Just%20Cause%20Complete%20Final%20-%20Web%20V2%20FINAL.pdf.  Moreover, the report admitted that the survey data "is self-reported by fast-food workers and *was not independently verified*."  *Id.*  In other words, the Committee took the Union at its word, which in turn took "self-sect[ing]" survey respondents at their word, and extrapolated those employees' experience to every fast-food worker in New York City.  The document's existence is relevant to the SEIU's control over the Committee and the Committee's desire to support the Union's efforts, but the document's contents are (1) wholly irrelevant to the arguments before this Court, *see* Fed. R. Evid. 401(b), and (2) fail to establish the absence or presence of a genuine dispute of material fact.  Fed. R. Civ. P. 56(c)(1)(B).

41.   On December 17, 2020, the City Council held a stated meeting during which it passed Intro. No. 1396-A-2019 by a vote of forty (40) in the affirmative and six (6) in the negative, and Intro. No. 1415-A-2019 by a vote of thirty-nine (39) in the affirmative and seven (7) in the negative.  *See* Ugalde Decl., Ex. W.

**Response:**   Plaintiffs admit that Int. No. 1396-A passed with a vote of 40 in the affirmative, 6 in the negative, and Int. No. 1415-A passed with a vote of 39 in the affirmative and 7 in the negative.

42.     During the December 17, 2020 stated meeting, City Council Member Corey Johnson, the City Council's Speaker, stated, in part, as follows:

> . . . Our last two Bills are designed o [sic] protect workers in our fast-food restaurants throughout New York City.  These workers are our most vulnerable to being fired without a cause related to their work performance and it has to stop. This practice prevents them from speaking out about harassment and poor working conditions and as we have seen during COVID-19 they continue to face dangerous conditions on the job.  We need the [sic] to be able to speak out without fear of being fired and we as a City need to protect them and these Bills work to do that[.]

*Id*. at 26:21 – 27:2.

**Response:**     Plaintiffs admit that the cited document contains, in part, the quoted language.  Plaintiffs deny the accuracy of Councilmember Johnson's comment about the impact of the Just Cause Laws as preexisting laws protect individuals from retaliation for speaking out against harassment and safety issues.

43.     During the December 17, 2020 stated meeting, City Council Member Adrienne Adams stated, in part, as follows:

> . . . Before the pandemic fast-food workers preformed [sic] dangerous and physically demanding work but now as essential workers their jobs have become more dangerous putting their health and family's health at risk.  In exchange, they are often faced with impossible choices, endure hostile working conditions, leave or be fired and face financial struggle without a job.  Just because [sic] Legislation is about giving working families economic stability and security and most importantly this is about treating workers with respect and dignity. . . .

*Id*. at 32:4 – 32:15.

**Response:**     Plaintiffs admit that the cited document contains, in part, the quoted language.  Plaintiffs deny the accuracy of Councilmember Adams' comment about the impact of the Just Cause Laws as preexisting laws protect individuals from retaliation for speaking out about hostile work environment conditions.

44.     On January 5, 2021, the Mayor approved Intro. Nos. 1396-A-2019 and 1415-A-2019 and signed them into Local Law 1 and Local Law 2.  *See* Ugalde Decl., Exs. X-Z.

**Response:**     Plaintiffs admit that on January 5, 2021, the Mayor signed Int. 1396-A and 1415-A into law as Local Law No. 1 and Local Law No. 2 of 2021.

45.     The provisions of Local Laws 1 and 2 took effect on July 4, 2021, except as follows: (a) the provisions of section 2 of Local Law 2 and the authority of DCWP to enforce the provisions of Local Laws 1 and 2 pursuant to N.Y.C. Admin. Code § 20-1207 take effect on September 2, 2021; and (b) DCWP has had authority to take such measures as are necessary for the implementation of Local Laws 1 and 2, including the promulgation of rules, since Local Laws 1 and 2 were adopted on January 5, 2021.  *See* Ugalde Decl., Ex. Y, § 8 & Ex. Z, § 7.

**Response:**     Plaintiffs admit that Local Law Nos. 1 and 2 took effect on July 4, 2021 except the provisions included in N.Y.C. Admin. Code § 20-1207 were set to take effect on September 2, 2021 and DCWP has authority to take measures to implement the laws, including the promulgation of rules.

### III.     The Wrongful Discharge Law

46.     Section 1 of Local Law 2 amended chapter 12 of title 20 of the N.Y.C. Admin. Code by adding a new subchapter 7, which is entitled "Wrongful Discharge of Fast Food Employees."  *See* Ugalde Decl., Ex. Z, § 1.

**Response:**     Plaintiffs admit that Local Law No. 2 amended Chapter 12 of title 20 of the administrative code of the city of New York by adding a new subchapter 7 entitled "Wrongful Discharge of Fast Food Employees."

47.     Subchapter 7 of chapter 12 of title 20 of the N.Y.C. Admin. Code, as amended by sections 1 through 6 of Local Law 1, consists of N.Y.C. Admin. Code §§ 20-1271 through 20-1275 (collectively, "Wrongful Discharge Law").  *See* Ugalde Decl., Exs. Y & Z.

**Response:**     Plaintiffs admit that subchapter 7 of Chapter 12 of title 20 of the N.Y.C. Admin. Code contains §§ 20-1271 through 20-1275, a part of the Just Cause Laws.

23

A.       **Employees and Employers Covered by the Wrongful Discharge Law**

48.       The Wrongful Discharge Law only applies to certain fast food employers, and certain fast food employees.  *See* Ugalde Decl., Ex. D at N.Y.C. Admin. Code §§ 20-1201, 20-1271 to 20-1275.

**Response:**       Denied.  Plaintiffs admit only that the Just Cause Laws contain definitions for "fast food employer" and "fast food employee" who would be impacted by the laws, but the Just Cause laws also implicitly apply to and impact others, including Plaintiffs.

49.       Under the Wrongful Discharge Law, a "fast food employer" (hereinafter "Covered Employer") is one that employs a "fast food employee" (hereinafter "Protected Employee") at a "fast food establishment" (hereinafter "Fast Food Establishment").  *Id.* § 20–1201.

**Response:**       Denied.  Plaintiffs admit only that as defined in N.Y.C. Admin. Code § 20-1201 the term "fast food employer" means any employer that employs a fast food employee at a fast food establishment.

50.       A Fast Food Establishment is "an[] establishment (i) that has as its primary purpose serving food or drink items; (ii) where patrons order or select items and pay before eating and such items may be consumed on the premises, taken out or delivered to the customer's location; (iii) that offers limited service; (iv) that is part of a chain; and (v) that is one of 30 or more establishments nationally, including (A) an integrated enterprise that owns or operates 30 or more such establishments in the aggregate nationally or (B) an establishment operated pursuant to a franchise where the franchisor and the franchisees of such franchisor own or operate 30 or more such establishments in the aggregate nationally."[2] *Id.*

---

[2] "The terms "chain," "integrated enterprise," "franchise," franchisor," and "franchisee" are defined in N.Y.C. Admin. Code § 20-1201.

**Response:**     Plaintiffs admit that as defined by N.Y.C. Admin. Code § 20-1201, the term "fast food establishment" contains the quoted definition.

51.     A Fast Food Establishment includes those establishments "located within non-fast food establishments." *Id*.

**Response:**     Plaintiffs admit that as defined by N.Y.C. Admin. Code § 20-1201, the term "fast food establishment" includes such establishments located within non-fast food establishments.

52.     A Protected Employee is a "person employed or permitted to work at or for a [F]ast [F]ood [E]stablishment by any employer that is located within the city where such person's job duties include at least one of the following: customer service, cooking, food or drink preparation, delivery, security, stocking supplies or equipment, cleaning or routine maintenance." *Id*.

**Response:**     Plaintiffs admit only that the term "fast food employee" as defined by N.Y.C. Admin. Code § 20-1201 means any person employed or permitted to work at or for a fast food establishment by any employer that is located within the city where such person's job duties include at least one of the following: customer service, cooking, food or drink preparation, delivery, security, stocking supplies or equipment, cleaning or routine maintenance.

53.     Protected Employees "do[] not include any employee who is salaried." *Id*.

**Response:**     Plaintiffs admit only that as defined by N.Y.C. Admin. Code § 20-1201 the term "fast food employee" does not include any employee who is salaried.

**B.     Prohibition on Wrongful Discharge of Protected Employees**

54.     A Covered Employer is prohibited from "discharging" a Protected Employee "who has completed such employer's probation period except for just cause or for a bona fide economic reason." *Id*. § 20-1272(a).

**Response:**     Plaintiffs admit only that the text of N.Y.C. Admin. Code § 20-1272(a) states that a "fast food employer shall not discharge a fast food employee who has completed such employer's probation period except for just cause or for a bona fide economic reason."

i.     Discharge for Just Cause

55.     Under the Wrongful Discharge Law, a Covered Employer may discharge a Protected Employee for "just cause" only if at least one of the following three grounds are present: (a) the Protected Employee "fail[ed] to satisfactorily perform job duties or misconduct that is demonstrably and materially harmful to the [Covered Employer's] legitimate business interests"; (b) there is an "egregious failure by the [Protected] [E]mployee to perform their duties"; or (c) "for egregious misconduct." *Id*. §§ 20-1271, 20-1272(c).

**Response:**     Plaintiffs admit only that the N.Y.C. Admin. Code § 20-20-1272 provides that a "fast food employer shall not discharge a fast food employee who has completed such employer's probation period except for just cause" and N.Y.C. Admin. Code § 20-20-1271 defines "just cause" to mean the fast food employee's failure to satisfactorily perform job duties or misconduct that is demonstrably and materially harmful to the fast food employer's legitimate business interests."

56.     For a "just cause" discharge to be based on the Protected Employee's "failure to satisfactorily perform job duties or misconduct that is demonstrably and materially harmful to the [Covered Employer's] legitimate business interests," the Covered Employer must, prior to discharge, also: (a) have "had a written policy on progressive discipline in effect at the [F]ast [F]ood [E]stablishment; (b) have provided such policy to the Protected Employee; and (c) have "utilized [and relied on] progressive discipline" that was issued to the Protected Employee within one year of discharge. *Id*. § 20-1272(c).

**Response:**   Plaintiffs admit only that N.Y.C. Admin. Code 20-1272(c) states that "[e]xcept where termination is for an egregious failure by the employee to perform their duties, or for egregious misconduct, a termination shall not be considered based on just cause unless (1) the fast food employer has utilized progressive discipline; provided, however, that the fast food employer may not rely on discipline issued more than one year before the purported just cause termination, and (2) the fast food employer had a written policy on progressive discipline in effect at the fast food establishment and that was provided to the fast food employee."

57.   Within 5 days of discharging a Protected Employee, the Covered Employer "shall provide a written explanation to the [Protected Employee] of the precise reasons for their [just cause] discharge." *Id*. § 20-1272(d).

**Response:**   Plaintiffs admit only that N.Y.C. Admin. Code 20-1272(d) states that "[w]ithin 5 days of discharging a fast food employee, the fast food employer shall provide a written explanation to the fast food employee of the precise reasons for their discharge."

58.   In an action or proceeding asserting a violation based on an alleged wrongful "just cause" discharge, the Covered Employer "bear[s] the burden of proving just cause . . . by a preponderance of the evidence . . . subject to the rules of evidence as set forth in the civil practice law and rules or, where applicable, the common law." *Id*. § 20-1272(e).

**Response:**   Plaintiffs admit only that N.Y.C. Admin. Code 20-1272(e) states that a "fast food employer shall bear the burden of proving just cause by a preponderance of the evidence in any proceeding brought pursuant to this subchapter, subject to the rules of evidence as set forth in the civil practice law and rules or, where applicable, the common law."

59.     In such an action or proceeding, the fact finder must (a) "determine[] whether a [Protected Employee] has been discharged for just cause" and (b) consider the following factors "in addition to any other relevant factors":

> 1.     The fast food employee knew or should have known of the fast food employer's policy, rule or practice that is the basis for progressive discipline or discharge;
>
> 2.     The fast food employer provided relevant and adequate training to the fast food employee;
>
> 3.     The fast food employer's policy, rule or practice, including the utilization of progressive discipline, was reasonable and applied consistently;
>
> 4.     The fast food employer undertook a fair and objective investigation into the job performance or misconduct; and
>
> 5.     The fast food employee violated the policy, rule or practice or committed the misconduct that is the basis for progressive discipline or discharge.

*Id.* § 20-1272(b).

**Response:**     Plaintiffs admit only that N.Y.C. Admin. Code § 20-1272(b) provides that "[i]n determining whether a fast food employee has been discharged for just cause, the factfinder shall consider, in addition to any other relevant factors, whether:

> 1. The fast food employee knew or should have known of the fast food employer's policy, rule or practice that is the basis for progressive discipline or discharge;
>
> 2. The fast food employer provided relevant and adequate training to the fast food employee;
>
> 3. The fast food employer's policy, rule or practice, including the utilization of progressive discipline, was reasonable and applied consistently;
>
> 4. The fast food employer undertook a fair and objective investigation into the job performance or misconduct; and

5. The fast food employee violated the policy, rule or practice or committed the misconduct that is the basis for progressive discipline or discharge."

60.    However, in such action or proceeding, the fact finder "may not consider any reasons proffered by the [Covered Employer] but not included in [its] written explanation provided to the [Protected Employee]." *Id*. § 20-1272(d).

**Response:**    Plaintiffs admit only that N.Y.C. Admin. Code § 20-1272(d) provides that "[i]n determining whether a fast food employer had just cause for discharge, the fact-finder may not consider any reasons proffered by the fast food employer but not included in such written explanation provided to the fast food employee."

ii.    <u>Discharge for a Bona Fide Economic Reason</u>

61.    Under the Wrongful Discharge Law, a Covered Employer may discharge a Protected Employee for "bona fide economic reasons" if: (a) the Covered Employer suffers "the full or partial closing of operations or technological or organizational changes to the business in response to the reduction in volume of production, sales, or profit"; and (b) the discharge is "supported by [its] business records showing that the closing, or technological or reorganizational changes are in response to a reduction in volume of production, sales, or profit." *Id*. §§ 20-1271, 20-1272(g).

**Response:**    Plaintiffs admit only that N.Y.C. Admin. Code § 20-1272(g) provides that a "discharge shall not be considered based on a bona fide economic reason unless supported by a fast food employer's business records showing that the closing, or technological or reorganizational changes are in response to a reduction in volume of production, sales, or profit" and that N.Y.C. Admin. Code § 20-1271 defines "bona fide economic reason" as  "the full or partial closing of operations or technological or organizational changes to the business in response to the reduction in volume of production, sales, or profit."

62.     A discharge based on bona fide economic reasons "shall be done in reverse order of seniority in the fast food establishment where the discharge is to occur, so that employees with the greatest seniority shall be retained the longest and reinstated or restored hours first." *Id*. § 20-1272(h).

**Response:**     Plaintiffs admit only that N.Y.C. Admin. Code § 20-1272(h) provides that "[d]ischarges of fast food employees based on bona fide economic reason shall be done in reverse order of seniority in the fast food establishment where the discharge is to occur, so that employees with the greatest seniority shall be retained the longest and reinstated or restored hours first."

63.     Within 5 days of discharging a Protected Employee, the Covered Employer "shall provide a written explanation to the [Protected Employee] of the precise reasons for their [bona fide economic reasons] discharge." *Id*. § 20-1272(d).

**Response:**     Plaintiffs admit only that N.Y.C. Admin. Code 20-1272(d) states that "[w]ithin 5 days of discharging a fast food employee, the fast food employer shall provide a written explanation to the fast food employee of the precise reasons for their discharge."

64.     In an action or proceeding asserting a violation based on an alleged wrongful discharge based on a bona fide economic reason, the Covered Employer "bear[s] the burden of proving . . . a bona fide economic reason by a preponderance of the evidence . . . subject to the rules of evidence as set forth in the civil practice law and rules or, where applicable, the common law." *Id*. § 20-1272(e).

**Response:**     Plaintiffs admit only that N.Y.C. Admin. Code 20-1272(e) states that a "fast food employer shall bear the burden of proving just cause by a preponderance of the

evidence in any proceeding brought pursuant to this subchapter, subject to the rules of evidence as set forth in the civil practice law and rules or, where applicable, the common law."

### C.    Available Actions and Proceedings to Enforce the Wrongful Discharge Law

65.    A person seeking redress for a violation of N.Y.C. Admin. Code § 201272 may either (a) "bring a civil action, in accordance with applicable law, in any court of competent jurisdiction," (b) "file a complaint with . . . [DCWP]," or (c) "[o]n or after January 1, 2022, . . . bring an arbitration proceeding" pursuant to the procedures set forth in N.Y.C. Admin. Code § 20-1273.  *Id*. §§ 20-1207(b)(1), 20-1211(a), 20-1273(a).

**Response:**    Plaintiffs admit the cited law contains the quoted language.

66.    If it receives a complaint filed pursuant to N.Y.C. Admin. Code § 20-1207(b)(1), DCWP must investigate it.  *Id*. § 20-1207(b)(2).  However, in the absence of such a complaint, DCWP "may open an investigation on its own initiative."  Id. § 20-1207(b)(3).  If, as a result of such investigation, it believes that there is a violation, DCWP "may attempt to resolve it through any action authorized by chapter 64 of the [City] [C]harter."  *Id*. § 20-1207(b)(4).

**Response:**    Plaintiffs admit the cited law contain the quoted language.

67.    If the person seeking redress opts for arbitration pursuant to N.Y.C. Admin. Code § 20-1273, (a) the appointed arbitrator "shall have appropriate qualifications and maintain personal objectivity," and (b) "each party shall have the right to present its case . . . [and] the right to apply to a court of competent jurisdiction for the confirmation, modification or vacatur of an award pursuant to article 75 of the civil practice law and rules, as such article applies, pursuant to applicable case law, to review of legally mandated arbitration proceedings in accordance with standards of due process."  *Id*. §§ 20-1273(h), 20-1273(j).

**Response:**    Plaintiffs admit the cited law contain the quoted language.

68.     In addition, the Corporation Counsel of the City of New York, or his or her designee, may (a) commence any action or proceeding that may be appropriate or necessary for correction of any violation of N.Y.C. Admin. Code § 20-1272, and (b) commence a civil action "[w]here reasonable cause exists to believe that an employer is engaged in a pattern or practice of violations of . . . [N.Y.C. Admin. Code § 20-1272]." *Id.* §§ 20-1210, 20-1212(a).

**Response:**     Plaintiffs admit the cited portion of the law contains the quoted language.

Dated:   New York, New York
         August 24, 2021

Respectfully submitted,

*/s/ Leni D. Battaglia*

Leni D. Battaglia
Samuel S. Shaulson
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178
T: 212-309-7177
leni.battaglia@morganlewis.com
sam.shaulson@morganlewis.com

William R. Peterson
Admitted *pro hac vice*
Morgan, Lewis & Bockius LLP
1000 Louisiana Street, Suite 4000 Houston, TX 77002
T: 713-890-5188
william.peterson@morganlewis.com

James D. Nelson
Admitted *pro hac vice*
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
T: 202-739-5411
james.nelson@morganlewis.com

Angelo I. Amador
Admitted *pro hac vice*
Restaurant Law Center
2055 L Street, NW Seventh Floor
Washington, DC 20036
T: 202-492-5037
aamador@restaurant.org