UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
                                     :
 RESTAURANT LAW CENTER, et al.,      :
                                     :
                      Plaintiffs,    :     21cv4801 (DLC)
            -v-                      :
                                     :     OPINION AND ORDER
 CITY OF NEW YORK, et al.,           :
                                     :
                      Defendants.    :
                                     :
------------------------------------ X

APPEARANCES:

For plaintiffs Restaurant Law Center and New York State
Restaurant Association:
Angelo Amador
Restaurant Law Center
2055 L Street, NW, Suite 700
Washington, DC 20036

Leni D. Battaglia
James D. Nelson
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Ave., NW
Washington, DC 20004

William R. Peterson
Morgan, Lewis & Bockius LLP
1000 Louisiana Street, Ste 4000
Houston, TX 77002

For defendants:
Georgia M. Pestana
New York City Law Department
Office of The Corporation Counsel
100 Church Street
New York, NY 10007

For Amicus Curiae Professors of Labor Law:
Hanan B. Kolko
Cohen Weiss and Simon LLP
900 Third Avenue, Ste 2100
New York, NY 10022

For <u>Amicus Curiae</u> National Employment Law Project, Make the Road
New York, the Center for Popular Democracy, A Better Balance,
the CUNY Urban Food Policy Institute, the New York Taxi Workers
Alliance, Community Voices Heard, and the Workers Justice
Project:
Wayne N. Outten
Outten & Golden, LLP
685 Third Avenue, 25th Floor
New York, NY 10017
(212) 245-1000

DENISE COTE, District Judge:

In 2021, the City of New York ("City") enacted a law
prohibiting the wrongful discharge of fast food restaurant
employees and expanding private enforcement avenues available to
them (the "Wrongful Discharge Law" or the "Law").  The
Restaurant Law Center ("RLC") and the New York State Restaurant
Association ("NYSRA"; together, "Plaintiffs") seek a declaration
of the Law's invalidity under the U.S. Constitution and State
law.  They have moved for summary judgment on all claims.  The
City has cross-moved for summary judgment, and urges the Court
to refrain from exercising supplemental jurisdiction over the
Plaintiffs' State law claims.  For the reasons set forth below,
the City's motion for summary judgment on the federal claims is
granted.  The Court declines to exercise supplemental
jurisdiction over the State law claims.

## Background

This litigation addresses a 2021 amendment to the City's Fair Workweek Law.  The City enacted the Fair Workweek Law in 2017 to expand wage and hour protections for employees working at fast food businesses.  N.Y.C. Admin. Code §§ 20-1201 to 20-1263.

The Fair Workweek Law governs employers operating a fast food establishment that is part of a chain with thirty or more establishments, measured nationally.  It defines a fast food establishment as

> [a]ny establishment (i) that has as its primary purpose serving food or drink items; (ii) where patrons order or select items and pay before eating and such items may be consumed on the premises, taken out or delivered to the customer's location; (iii) that offers limited service; (iv) that is part of a chain;[1] and (v) <u>that is one of 30 or more establishments nationally</u>, including . . . an establishment operated pursuant to a franchise where the franchisor and the franchisees of such franchisor own or operate 30 or more such establishments in the aggregate nationally.

N.Y.C. Admin. Code § 20-1201 (emphasis added).  A "fast food employee . . . does not include any employee who is salaried." <u>Id.</u>

---

[1] "The term 'chain' means a set of establishments that share a common brand or that are characterized by standardized options for decor, marketing, packaging, products and services."  N.Y.C. Admin. Code § 20-1201.

3

On December 17, 2020, the City Council amended the Fair Workweek Law by enacting the Wrongful Discharge Law at issue in this case.  The Wrongful Discharge Law was signed by the Mayor and the provisions at issue here went into effect on July 4, 2021.  N.Y.C. Admin. Code §§ 20-1271 to 20-1275.

The Wrongful Discharge Law prohibits the employers governed by the Fair Workweek Law from firing hourly wage employees without notice or reason in the absence of egregious misconduct, and provides those employees with the option to arbitrate claims of alleged violations of the Law.  Provisions of the Wrongful Discharge Law that are significant to the discussion that follows include the following.

I.   The Just Cause Provision

The Just Cause Provision states that a "fast food employer shall not discharge a fast food employee who has completed such employer's probation period[2] except for just cause or for a bona fide economic reason."[3]  Id. § 20-1272(a).  Section 20-1271 provides definitions of the operative terms in the Provision.

---

[2] The Wrongful Discharge Law defines the probation period as "a defined period of time, not to exceed 30 days from the first date of work of a fast food employee, within which fast food employers and fast food employees are not subject to the prohibition on wrongful discharge set forth in section 20-1272." N.Y.C. Admin. Code § 20-1271.

[3] The term "bona fide economic reason" is defined as "the full or partial closing of operations or technological or organizational

A discharge is defined as "any cessation of employment, including layoff, termination, constructive discharge, reduction in hours and indefinite suspension." Id. § 20-1271. A reduction in hours "means a reduction in a fast food employee's hours of work totaling at least 15 percent of the employee's regular schedule or 15 percent of any weekly work schedule." Id.

"Just cause" is defined as "the fast food employee's failure to satisfactorily perform job duties or misconduct that is demonstrably and materially harmful to the fast food employer's legitimate business interests." Id. There are five nonexclusive factors that a fact-finder must consider when determining whether a just cause discharge occurred. Id. §§ 20-1271, 20-1272(b).

The factors include consideration of the employer's utilization of a "progressive discipline" policy. "Progressive discipline" means

> a disciplinary system that provides for a graduated
> range of reasonable responses to a fast food
> employee's failure to satisfactorily perform such
> fast food employee's job duties, with the
> disciplinary measures ranging from mild to severe,
> depending on the frequency and degree of the failure.

---

changes to the business in response to the reduction in volume of production, sales, or profit." N.Y.C. Admin. Code § 20-1271.

Id. § 20-1201.  Except for an employee's egregious misconduct, a termination is not for just cause unless the employer utilized progressive discipline.  Id. § 20-1272(c).

Finally, an employer must supply the former employee with a written explanation containing "the precise reasons for their discharge" within five days of discharge.  Id. § 20-1272(d).  In any subsequent action alleging a violation of the Just Cause Provision, the employer bears the burden of establishing that the discharge was valid, and a fact-finder is limited to consideration of the employer's written reasons it provided to the employee.  Id. § 20-1272(d)-(e).

II.  The Arbitration Provision

The Wrongful Discharge Law also amended the Fair Workweek Law by giving employees a right to arbitrate a claim of wrongful discharge (the "Arbitration Provision").  Id. § 20-1273. Previously, the Fair Workweek Law provided two avenues for enforcement:  administrative enforcement by the New York City Department of Consumer and Worker Protection ("DCWP") upon an employee's complaint, id. § 20-1207, or direct private action in court by an employee, id. § 20-1211.

The Arbitration Provision adds that "any person or organization representing persons alleging a violation" of the Wrongful Discharge Law may bring an arbitration proceeding.  Id.

6

§ 20-1273(a).  An employee who prevails in arbitration is
entitled to attorneys' fees and costs, reinstatement or
restoration of hours, and "all other appropriate equitable
relief," including "such other compensatory damages or
injunctive relief as may be appropriate."  Id.  The DCWP may
"provide by rule for persons bringing such a proceeding to serve
as a representative party on behalf of all members of a class."
Id.

Once an employee selects arbitration to pursue a claim, it
"shall be the exclusive remedy for the wrongful discharge
dispute."  Id. § 20-1273(i).  The parties may petition for
judicial review of the outcome of any arbitration proceeding.
Id. § 20-1273(j).

III. Procedural History

Plaintiff RLC is a public policy organization based in
Washington, D.C. that is affiliated with the National Restaurant
Association, a food service trade association.  Plaintiff NYSRA
is a not-for-profit hospitality association with over 10,000
food service members in the State, including approximately 1,000
members in New York City.  Some of those member food service
establishments are fast food restaurants.

The RLC and NYSRA initiated this action on May 28, 2021.
They challenge the City's authority to enact the Wrongful

7

Discharge Law and seek declaratory and injunctive relief.  They bring this action under 42 U.S.C. § 1983 and assert that the Wrongful Discharge Law violates the dormant Commerce Clause and Supremacy Clause of the U.S. Constitution, in addition to raising claims under New York State law.[4]  The parties have agreed to litigate these claims through cross-motions for summary judgment.

An Order of February 1, 2022 granted two motions by <u>amicus curiae</u> for leave to file briefs in support of the City.  The <u>amici</u> are Professor Kate Andrias and other Professors of Labor Law, and a group of organizations including the National Employment Law Project, Make the Road New York, the Center for Popular Democracy, A Better Balance, the CUNY Urban Food Policy Institute, the New York Taxi Workers Alliance, Community Voices Heard, and the Workers Justice Project.

## Discussion

The City challenges the Plaintiffs' standing to bring these claims.  Finding that at least the NYSRA has standing, this Opinion will address the Plaintiffs' challenges to the Wrongful

---

[4] The Plaintiffs claim that the Just Cause Provision is preempted by New York State's at-will employment common law and violates the New York Constitution's home rule clause, and that the Arbitration Provision violates the Plaintiffs' right to a trial by jury and invades the jurisdiction of the New York Supreme Court.

Discharge Law as preempted by the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 et seq., and then as a violation of the dormant Commerce Clause.  Next, the Opinion addresses the Plaintiffs' claim that the Arbitration Provision is preempted by the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq. Having concluded that the City Law survives these challenges, the Opinion will address whether to exercise supplemental jurisdiction.

I.   Standing

As a threshold matter, the City challenges the Plaintiffs' standing to bring this action.  The case-or-controversy requirement of Article III encompasses "the requirement that the plaintiff establish standing to sue."  Stagg, P.C. v. U.S. Dep't of State, 983 F.3d 589, 601 (2d Cir. 2020).  "A plaintiff must demonstrate standing for each claim and form of relief sought." Carver v. City of New York, 621 F.3d 221, 225 (2d Cir. 2010) (citation omitted).

An organization does not have standing "to assert the rights of its members in a case brought under 42 U.S.C. § 1983." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).  An organization may nonetheless bring a § 1983 suit on its own behalf "so long as it can independently satisfy the requirements of Article III standing."  Connecticut Citizens Def. League,

Inc. v. Lamont, 6 F.4th 439, 447 (2d Cir. 2021) (citation
omitted).  To meet those requirements, a plaintiff must have
"(1) suffered an injury in fact, (2) that is fairly traceable to
the challenged conduct of the defendant, and (3) that is likely
to be redressed by a favorable judicial decision."  Melito v.
Experian Marketing Solutions, Inc., 923 F.3d 85, 92 (2d Cir.
2019) (citation omitted).  The "injury in fact" must be
"concrete and particularized" and "actual or imminent, not
conjectural or hypothetical."  Liberian Cmty. Ass'n of
Connecticut v. Lamont, 970 F.3d 174, 184 (2d Cir. 2020) (quoting
Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).
Where an organization "diverts its resources away from its
current activities, it has suffered an injury that is
independently sufficient to confer organizational standing."
Connecticut Citizens Def. League, 6 F.4th at 477 (citation
omitted).  The presence of one party with standing "is
sufficient" to satisfy Article III's case-or-controversy
requirement.  Centro de la Comunidad Hispana de Locust Valley v.
Town of Oyster Bay, 868 F.3d 104, 109 (2d Cir. 2017) (citation
omitted).

     The NYSRA has standing to pursue its federal claims.  The
NYSRA has "devoted time, money, and effort to informing our
members about the Laws' requirements, discussing its potential

implications, and attempting to clarify compliance requirements."  These efforts have included hosting a February 2021 webinar on the Wrongful Discharge Law.  NYSRA's response to the Law has diverted time that would have otherwise been spent on "advocacy on behalf of restaurants and preparation of training classes," as well as on "working to lift COVID-19 restrictions on restaurants and obtain funding in the State's budget to provide restaurants financial relief from the economic harm caused by those restrictions."  This showing is sufficient to establish injury in fact under a theory of diverted resources.

II.  Federal Law Claims

    A.  NLRA Preemption

The Plaintiffs principally contend that the Wrongful Discharge Law is preempted by the federal NLRA.  "A fundamental principle of the Constitution is that Congress has the power to preempt state law."  <u>Crosby v. Nat'l Foreign Trade Council</u>, 530 U.S. 363, 372 (2000).

> In general, three types of preemption exist: (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives.

New York SMSA Ltd. Partnership v. Town of Clarkstown, 612 F.3d 97, 104 (2d Cir. 2010) (citation omitted).  Both field and conflict preemption "are usually found based on implied manifestations of congressional intent."  Id.  Preemption analysis "begins with the assumption that the historic police powers of the States are not to be superseded by federal law unless that is the clear and manifest purpose of Congress."  Figueroa v. Foster, 864 F.3d 222, 232 (2d Cir. 2017) (citation omitted).

The NLRA does not contain an express preemption provision.  The doctrine of labor law preemption, therefore, "concerns the extent to which Congress has placed implicit limits on the permissible scope of state regulation of activity touching upon labor-management relations."  Ass'n of Car Wash Owners Inc. v. City of New York, 911 F.3d 74, 80 (2d Cir. 2018) ("Car Wash") (quoting N.Y. Tel. Co. v. N.Y. State Dep't of Labor, 440 U.S. 519, 527 (1979)).

The Supreme Court has established two implied preemption doctrines under the NLRA.  Id.  The first, Garmon preemption, is named after the Supreme Court's decision in San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236 (1959).  Under Garmon preemption, the NLRA "preempts state regulation that either prohibits conduct subject to the regulatory jurisdiction of the

National Labor Relations Board under section 8 of the NLRA or facilitates conduct prohibited by section 7 of the NLRA." <u>Car Wash</u>, 911 F.3d at 80.  Section 7 of the NLRA "guarantee[s] employees the right to organize and engage in other forms of protected concerted action," and § 8 identifies "forms of unfair labor practices." <u>Id.</u> at 81 (citation omitted).  The Plaintiffs do not argue that <u>Garmon</u> preemption exists here.[5]

The second form of NLRA preemption, known as <u>Machinists</u> preemption after the Supreme Court's decision in <u>Lodge 76 Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Wis. Emp't Relations Comm'n</u>, 427 U.S. 132 (1976), preempts "state law and state causes of action concerning conduct that Congress intended to be unregulated." <u>Metro. Life Ins. Co. v. Massachusetts</u>, 471 U.S. 724, 749 (1985) ("<u>Metropolitan Life</u>").  <u>Machinists</u> preemption "forbids states and localities from intruding upon the labor-management bargaining process." <u>Car Wash</u>, 911 F.3d at 81 (citation omitted).  The doctrine relies

> on the understanding that in providing in the NLRA a framework for self-organization and collective bargaining, Congress determined both how much the conduct of unions and employers should be regulated,

---

[5] In their complaint of May 28, 2021, the Plaintiffs alleged that the Wrongful Discharge Law is invalid under <u>Garmon</u>, but do not pursue this argument in their motion for summary judgment. Accordingly, the Plaintiffs' <u>Garmon</u> claim is deemed abandoned. <u>See</u> <u>Kovaco v. Rockbestos-Surprenant Cable Corp.</u>, 834 F.3d 128, 143 (2d Cir. 2016).

and how much it should be left unregulated.  Under
this theory of NLRA preemption, the crucial inquiry is
whether Congress intended that the conduct involved be
unregulated because such conduct was left to be
controlled by the free play of economic forces.

Id. (citation omitted).  In other words, "even regulation that
does not actually or arguably conflict with the provisions of
sections 7 or 8 of the NLRA may interfere with the open space
created by the NLRA."  Id. (citation omitted).

The critical inquiry under Machinists preemption is whether
state or local regulation "frustrates effective implementation
of the NLRA's processes."  Id. at 82 (citation omitted).
"States are therefore prohibited from imposing additional
restrictions on economic weapons of self-help, such as strikes
or lockouts, unless such restrictions presumably were
contemplated by Congress."  Golden State Transit Corp. v. City
of Los Angeles, 475 U.S. 608, 614-15 (1986) (citation omitted).
In Machinists, for example, the Supreme Court held that
Wisconsin could not prohibit a union's members from refusing to
work overtime as a collective bargaining tactic without
frustrating the NLRA's comprehensive regulatory scheme governing
labor relations.  427 U.S. at 148-51.

The NLRA is concerned with establishing "an equitable
process for determining terms and conditions of employment, and
not with particular substantive terms of the bargain that is

struck when the parties are negotiating from relatively equal positions." Metropolitan Life, 471 U.S. at 753.  States and localities therefore remain free to set minimum labor standards that "affect union and nonunion employees equally, and neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA." Car Wash, 911 F.3d at 81 (quoting Metropolitan Life, 471 U.S. at 755).  Minimum labor standards enacted by states under their traditional police powers appropriately "set a baseline for employment negotiations." Id. at 82 (citation omitted).  Thus in Metropolitan Life, the Supreme Court held that the NLRA did not preempt a Massachusetts law requiring employers to provide mental health benefits, including for employees covered by collective bargaining agreements, because the State law contained "minimum standards independent of the collective-bargaining process that devolve on employees as individual workers, not as members of a collective organization."  471 U.S. at 755 (citation omitted).

The Second Circuit in Concerned Home Care relied on these principles to hold that the NLRA did not preempt New York's Wage Parity Law, which fixed minimum rates of compensation for home care aides working in New York City and surrounding counties. Concerned Home Care Providers, Inc. v. Cuomo, 783 F.3d 77, 85

(2d Cir. 2015).  Those fixed rates could be superseded by rates in the largest collective bargaining agreement covering home care aides.  Id. at 85-87.  The court reasoned that the State's "unexceptional exercise" of its traditional power to stabilize minimum wages in a particular industry was not "designed to encourage or discourage employees in the promotion of their interests collectively," and "neither distinguishe[d] between unionized and non-unionized aides, nor treat[ed] employers differently based on whether they employ unionized workers." Id. at 85 (quoting Metropolitan Life, 471 U.S. at 755).

For the same reasons, the City's Wrongful Discharge Law is a validly enacted minimum labor standard.  The Law is one of general applicability aimed at promoting job stability for hourly employees in a particular sector -- the fast food restaurant industry.  The Just Cause Provision makes no distinction between fast food employees who are unionized and those who are not.  It regulates the process through which fast food employees may be lawfully terminated from their positions and has no impact on the process by which collective bargaining occurs.  The Law joins a plethora of valid state and local laws "that form a backdrop" of rights against which both "employers and employees come to the bargaining table."  Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 21 (1987) (citation omitted);

16

see also, e.g., Rhode Island Hosp. Ass'n v. City of Providence
ex rel. Lombardi, 667 F.3d 17, 33 (1st Cir. 2011) (rejecting an
NLRA preemption challenge to a worker retention ordinance); St.
Thomas--St. John Hotel & Tourism Ass'n, Inc. v. Gov't of U.S.
Virgin Islands, 218 F.3d 232, 243-44 (3d Cir. 2000) (rejecting
an NLRA preemption challenge to a wrongful discharge statute).

The Plaintiffs argue that the Wrongful Discharge Law
invades the collective bargaining process.  They assert that the
Law's protections against the arbitrary termination of
employment are too detailed and improperly tread on an area that
unions typically address during collective bargaining.  While
states may not regulate the collective bargaining process, they
retain broad authority to regulate substantive labor standards.
Car Wash, 911 F.3d at 82.  Preemption may not be lightly
inferred, and the regulation of the process for termination of
employment -- even through a detailed law -- is not the
regulation of the collective bargaining process and is not
preempted by the NLRA.

The Plaintiffs next contend that the Wrongful Discharge Law
is preempted by the NLRA because its Arbitration Provision
favors unions.  They reason that employers and unions typically
negotiate a no-strike agreement in exchange for an agreement to
arbitrate.  Because of the Law, employers must submit to

arbitration at an employee's request but can't prevent a strike.
Whether the absence of this quid pro quo favors unions is
debatable.  But, for purposes of a preemption analysis, the
creation of the duty to arbitrate is not fatal.  Both union and
nonunion employees are affected by the same Law in equal ways:
they may request and enforce a request to arbitrate covered
disputes.[6]

The Plaintiffs next argue that the Wrongful Discharge Law
invades the collective bargaining process by denying employers
the NLRA-protected right to wield lockouts as an "economic
weapon" during labor disputes.  They are wrong; the Wrongful
Discharge Law does not prevent covered employers from engaging
in lockouts.

"A lockout occurs when an employer temporarily shuts down
its business and advises employees that they will not be allowed

---

[6] To further support their arguments, the Plaintiffs cite
extensively to the legislative history of the Wrongful Discharge
Law, including public statements by sitting Councilmembers.
When examining the preemptive effect of a federal statute, a
court looks to "the text and context of the law in question and
[is] guided by the traditional tools of statutory
interpretation."  Virginia Uranium, Inc. v. Warren, 139 S. Ct.
1894, 1901 (2019).  "Where the plain meaning of the text is
clear, [the] inquiry generally ends there."  Jingrong v. Chinese
Anti-Cult World All. Inc., 16 F.4th 47, 57 (2d Cir. 2021)
(citation omitted).  The plain meaning of the Wrongful Discharge
Law is not disputed, and no construction of the text
necessitating reference to the legislative history is called for
in this case.

to work until contract agreement is reached between the employer and the union."  <u>Labor-Management Relations: Strikes, Lockouts and Boycotts</u>, ch. 9, § 9:1 (2d ed., 2021-2022).  In connection with a law that bars the hiring of strike-breakers, the City's administrative code defines a lockout as

> [a] refusal by an employer to permit his employees to work <u>as a result of a dispute</u> with such employees that affects wages, hours and other terms and conditions of employment of said employees, provided, however, that <u>a lockout shall not include a termination of employment</u> for reasons deemed proper under New York state and federal law.

N.Y.C. Admin. Code § 22-501 (emphasis added).

The Wrongful Discharge Law protects individual employees who are "discharged," which includes a reduction of 15% or more in hours, by defining a process for the discharge of that individual from employment.  It does not impose liability on employers who have locked out all employees due to a dispute with its employees over the terms of employment.[7]  The Plaintiffs do not suggest that the NLRA as a general matter preempts the City from adopting regulations that impact the termination of employment.  After all, it is common for state and local authorities to regulate the terms on which private employers may terminate employees.  For instance, local laws ban termination

---

[7] It is noteworthy that the Plaintiffs bring a facial challenge to the Wrongful Discharge Law, and not an as-applied challenge.

of employment for discriminatory or retaliatory reasons.  See,
e.g., N.Y. Exec. L. § 290 et seq.; N.Y.C. Admin. Code §§ 8-101
et seq.  Other local laws prevent the termination of employment
when a business changes hands.  See, e.g., Rhode Island Hosp.
Ass'n, 667 F.3d at 33.

　　　Finally, the Plaintiffs point to two decisions from the
Ninth and Seventh Circuits, Chamber of Commerce v. Bragdon, 64
F.3d 497 (9th Cir. 1995), and 520 South Michigan Avenue
Associates v. Shannon, 549 F.3d 1119 (7th Cir. 2008), to argue
that the Law is preempted because it targets employers within a
particular industry.  These decisions have not been followed in
this Circuit.  See Concerned Home Care, 783 F.3d at 86 n.8; see
also Rondout, 335 F.3d at 169 (distinguishing Bragdon).
Moreover, the Ninth Circuit has narrowed its decision in
Bragdon, finding that "the NLRA does not authorize us to pre-
empt minimum labor standards simply because they are applicable
only to particular workers in a particular industry."
Associated Builders & Contractors of S. California, Inc. v.
Nunn, 356 F.3d 979, 990 (9th Cir. 2004), as amended, No. 02-
56735, 2004 WL 292128 (9th Cir. Feb. 17, 2004)).  Shannon, which
relied on Bragdon, has similarly lost its persuasive authority.
See Shannon, 549 F.3d at 1136.  More significantly, this Circuit
has upheld laws affecting the conditions of employment of

20

workers in a particular industry against challenges that they
were preempted by the NLRA.  See, e.g., Car Wash, 911 F.3d at 84
(reduced surety bond for a business license to operate a car
wash if the employer was party to a collective bargaining
agreement); Concerned Home Care, 783 F.3d at 85-86 (setting
minimum wage rates for home care aides); Rondout Elec., Inc. v.
N.Y. State Dep't of Labor, 335 F.3d 162, 168-70 (2d Cir. 2003)
(setting minimum benefits for employees on public works
projects).

　　　For the reasons explained, the Wrongful Discharge Law does
not "frustrate effective implementation of the [NLRA's]
processes." Machinists, 427 U.S. at 148 (quoting R.R. Trainmen
v. Jacksonville Terminal Co., 394 U.S. 369, 380 (1969)).  The
City's cross-motion for summary judgment on the claim that the
Wrongful Discharge Law is preempted by the NLRA is therefore
granted.

　　　B.   Dormant Commerce Clause

　　　The Plaintiffs allege that the Wrongful Discharge Law is
unconstitutional under the Commerce Clause of the U.S.
Constitution, which empowers Congress "to regulate Commerce
. . . among the several States." U.S. Const. art. I, § 8,
cl. 3.  The Commerce Clause also carries a "corresponding
'negative' or 'dormant' aspect that limits the power of local

21

governments to enact laws affecting interstate commerce." New York Pet Welfare Ass'n, Inc. v. City of New York, 850 F.3d 79, 89 (2d Cir. 2017) ("NYPWA") (citation omitted).  The Supreme Court has explained that "[o]ur dormant Commerce Clause jurisprudence . . . is driven by a concern about economic protectionism -- that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." McBurney v. Young, 569 U.S. 221, 235 (2013) (quoting New Energy Co. of Ind. v. Limbach, 486 U.S. 269 (1988)).  "Analysis of state and local laws under the dormant Commerce Clause treads a well-worn path.  A court must first assess whether the challenged law discriminates against interstate commerce, or regulates evenhandedly with only incidental effects on interstate commerce." VIZIO, Inc. v. Klee, 886 F.3d 249, 254 (2d Cir. 2018) (citation omitted). Discrimination "means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." NYPWA, 850 F.3d at 89.

"The Supreme Court has recognized three modes of discrimination against interstate commerce: a law may discriminate on its face, harbor a discriminatory purpose, or discriminate in its effect." Id. at 90.  A discriminatory law is subject to heightened scrutiny and is permissible "only if

the state shows [the law is] demonstrably justified by a valid factor unrelated to economic protectionism." Id. at 89-90 (quoting Wyoming v. Oklahoma, 502 U.S. 437, 454 (1992)). "This justification must show a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." Id. at 90 (quoting Dep't of Revenue of Ky. v. Davis, 553 U.S. 328, 338 (2008)).

By contrast, a nondiscriminatory law that only imposes "incidental burdens on interstate commerce" is analyzed under the more forgiving balancing test set out in Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970). See VIZIO, 886 F.3d at 254 (citation omitted). Under the Pike test, a nondiscriminatory law will be upheld "unless the challenger shows that the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits." NYPWA, 850 F.3d at 90 (quoting Pike, 397 U.S. at 142).

1.   Discriminatory Effect

The Plaintiffs contend that the Wrongful Discharge Law has a discriminatory effect on interstate commerce since it restricts its applications to those businesses with thirty or more locations within the United States and to franchisees that do business with national brands. They argue that this jurisdictional limitation puts interstate businesses at a

competitive disadvantage when compared to businesses located exclusively within New York State.  The Wrongful Discharge Law does not violate the dormant Commerce Clause.

The Wrongful Discharge Law does not control out-of-state commerce or require out-of-state commerce to be conducted in a manner consistent with the Law.  Moreover, it makes no express distinction between national fast food chains and chains with more than thirty locations that are located solely within New York State.  The Law does not target chains because they are related to out-of-state brands.  The provision of the Law on which the Plaintiffs focus this argument is simply a neutral metric to describe the scale of the enterprise that must comply with the Law.  Indeed, the metric is part of the City's Fair Workweek Law, which the Wrongful Discharge Law amended.  N.Y.C. Admin. Code § 20-1201.

The Plaintiffs insist that, its facial neutrality notwithstanding, the City's inability to identify any intrastate restaurant brand or franchise that is governed by the Law is fatal to the Law's constitutionality.  Even without an example of a purely intrastate business of a qualifying size, the Law does not benefit in-state restaurant chains "at the expense of out-of-state competitors." Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 169 (2d Cir. 2005) (citation

omitted).  Only those establishments operating within the City are impacted by the Law.

In VIZIO, the Second Circuit declined to find a regulation discriminatory where it referred to national market share in deciding which in-state firms would be governed by the local regulation.  VIZIO, 886 F.3d 249 at 255.  Reference to national market share had "not before been acknowledged in [the Second Circuit's] dormant Commerce Clause jurisprudence," and the court declined to do so for the first time in VIZIO.  Id.  This principle applies with equal force here.

The Plaintiffs rely on the Eleventh Circuit's decision in Cachia v. Islamorada, 542 F.3d 839 (11th Cir. 2008), to support their claim that the Wrongful Discharge Law is discriminatory. Cachia held that a locality's zoning law that excluded "formula restaurants" had the "practical effect of discriminating against interstate restaurants."  Id. at 843.  Cachia is not instructive in this case.  The zoning law at issue in Cachia prohibited national chain restaurants from entering local commerce, while the Wrongful Discharge Law regulates the "methods of operation" for fast food restaurants and only to the extent that they employ hourly wage employees in the City.  See id.  The Law, accordingly, imposes no more "than an indirect burden on interstate restaurant operations."  Id.

2.    The Pike Test

Because the Wrongful Discharge Law imposes no more than an incidental burden on the interstate market for fast food restaurants, the Pike test must be applied to determine whether the burdens imposed by the Wrongful Discharge Laws are "clearly excessive" in relation to its local benefits.  Pike, 397 U.S. at 142.  "The Pike test is often directed at differentiating 'protectionist measures' from those that 'can fairly be viewed as . . . directed to legitimate local concerns.'"  VIZIO, 886 F.3d at 259 (quoting Philadelphia v. New Jersey, 437 U.S. 617, 624 (1978)).  A state may validly impose incidental burdens on interstate commerce "to promote safety or general welfare."  Id. To violate the Commerce Clause, at minimum, the burden imposed on interstate commerce must be shown to be "qualitatively or quantitatively different from that imposed on intrastate commerce."  Town of Southold v. Town of E. Hampton, 477 F.3d 38, 50 (2d Cir. 2007) (citation omitted).  "Burdens supportive of an unconstitutional finding have been recognized in the following situations: regulations that have a disparate impact on in-versus out-of-state entities, laws that regulate beyond the state's borders, and laws that create regulatory inconsistencies between states."  VIZIO, 886 F.3d at 259 (citation omitted); see

26

also Brown & Williamson Tobacco Corp. v. Pataki, 320 F.3d 200, 208-09 (2d Cir. 2003).

Applying the Pike test, the Law does not violate the dormant Commerce Clause.  The Law is a general welfare statute. The costs of employing hourly wage workers in the City while complying with the Law are not "qualitatively or quantitatively different" for intrastate or interstate businesses.  See Town of Southold, 477 F.3d at 50.  The regulatory costs of the Law are not distributed based on distinction between in-state and out-of-state enterprises.  Since the Commerce Clause "protects the interstate market, not particular interstate firms," NYWPA, 850 F.3d at 90 (quoting Exxon Corp. v. Maryland, 437 U.S. 117, 127 (1978)), there is no basis to find that the Wrongful Discharge Law runs afoul of the Pike test.

C.   FAA Preemption

The Plaintiffs allege that the Arbitration Provision in the Wrongful Discharge Law is preempted by the FAA.  The law regarding preemption is set forth above.  The Plaintiffs do not suggest that the FAA contains an express provision that preempts the Arbitration Provision or rely on a theory of field preemption.  They appear to assert that the Arbitration Provision conflicts with the FAA such that it is impossible for a party to comply with both.

27

"The FAA requires courts to enforce arbitration agreements according to their terms." Lamps Plus, Inc. v. Varela, 139 S. Ct. 1407, 1415 (2019) (quoting Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612, 1621 (2018)).  Specifically, the FAA provides that

> A written provision in any . . . contract evidencing a
> transaction involving commerce to settle by
> arbitration a controversy thereafter arising out of
> such contract or transaction, or the refusal to
> perform the whole or any part thereof, or an agreement
> in writing to submit to arbitration an existing
> controversy arising out of such a contract,
> transaction, or refusal, shall be valid, irrevocable,
> and enforceable, save upon such grounds as exist at
> law or in equity for the revocation of any contract.

9 U.S.C. § 2 (emphasis added).  States may not prohibit private agreements to arbitrate.  See AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 341 (2011).

The Arbitration Provision of the Wrongful Discharge Law does not prohibit or impair the enforcement of private arbitration agreements.  Private parties, including fast food employers and employees, remain free to agree to submit disputes to arbitration, and the Wrongful Discharge Law does not interfere with the enforcement of such agreements.

In arguing that the FAA prohibits the arbitration scheme enacted in the Wrongful Discharge Law, the Plaintiffs chiefly rely on the Supreme Court's description of the "foundational FAA principle" that "[a]rbitration is strictly a matter of consent," and that arbitrators "derive their powers from the parties'

agreement to forgo the legal process and submit their disputes to private dispute resolution." Lamps Plus, 139 S. Ct. at 1415-16 (quoting Granite Rock Co. v. Teamsters, 561 U.S. 287, 299 (2010) and Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 682 (2010)).  The FAA, however, is silent on the subject of compelled arbitration.  The Plaintiffs have failed to demonstrate that the FAA preempts the Arbitration Provision of the Wrongful Discharge Law.

III. Supplemental Jurisdiction

The Plaintiffs also bring four state law claims.  A district court may decline to exercise supplemental jurisdiction over a state law claim if "the claim raises a novel or complex issue of State law" and/or the district court "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(1), (3).  Once a court has dismissed all federal claims, it must decide whether the traditional values of "economy, convenience, fairness, and comity" counsel against the exercise of supplemental jurisdiction.  Catzin v. Thank You & Good Luck Corp., 899 F.3d 77, 85 (2d Cir. 2018) (citation omitted).

> In weighing these factors, the district court is aided
> by the Supreme Court's additional guidance in
> [Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343
> (1988),] that in the usual case in which all federal-
> law claims are eliminated before trial, the balance of
> factors will point toward declining to exercise
> jurisdiction over the remaining state-law claims.

<u>Kolari v. New York-Presbyterian Hosp.</u>, 455 F.3d 118, 122 (2d Cir. 2006).

There is no reason in this case to depart from the ordinary practice of dismissing the remaining state law claims.  Each of the federal claims has been resolved.  Judicial economy and comity weigh in favor of dismissal.

The Plaintiffs argue that judicial economy would be served by deciding the state law claims raised in this action.  The legal framework for addressing the federal and state law claims differs substantially.  In addition, this litigation presents novel and complex issues of state law.  Accordingly, the Court will not exercise supplemental jurisdiction over the state law claims.

## Conclusion

The Plaintiffs' July 20, 2021 motion for summary judgment on their federal claims is denied.  The City's cross-motion is granted with respect to the Plaintiffs' federal claims.  The Court declines to exercise supplemental jurisdiction over the state law claims and they are dismissed without prejudice to

refiling in state court.  The Clerk of Court shall close the

case.

Dated:       New York, New York
             February 10, 2022

                                        _____
                                              DENISE COTE
                                        United States District Judge

31